Ronald J. KORMANIK and Michael D. Sydow, Appellants,

v.

Victor SEGHERS, Appellee.

No. 14–09–00815–CV.

Court of Appeals of Texas, Houston (14th Dist.).

June 14, 2011.

Supplemental Opinion on Overruling of Rehearing Jan. 12, 2012.

*by v. Santillan,* which has been submitted in cause number 09–0497 in that court.

Brock C. Akers, Houston, for appellants.

Carl A. Generes, Dallas, David J. Wukoson, Houston, for appellee.

Panel consists of Justices ANDERSON, FROST, and BROWN.

## OPINION

KEM THOMPSON FROST, Justice.

Two lawyers sued an African art aficionado claiming he breached a contract to pay them a flat fee for implementing a marketing plan for an extensive Tikar art collection. The jury found that an attorney-client relationship existed between one of the lawyers and the art aficionado at the time of the contract and that this lawyer did not comply with his fiduciary duty. The jury did not find any damages to the other lawyer resulting from this breach. On appeal, the lawyers challenge the sufficiency of the evidence as to these jury findings. We affirm.

I. FACTUAL AND PROCEDURAL BACKGROUND

Appellee/defendant Victor Seghers, a Belgian cardiologist, is an aficionado of the art and culture of the Tikar people of Cameroon. Seghers, who had accumulated a substantial collection of Tikar art, made arrangements with a contact in Cameroon, Emmanuel Mbiam, for shipment of a portion of the collection to Texas, where Seghers lives. Seghers encountered difficulties and significant expense in the process. When he was unable to gain possession of the art, Seghers sought assistance from appellant/plaintiff Ronald J. Kormanik, a Texas lawyer. Seghers met and consulted with Kormanik in Texas and explained the problems he had encountered.

In July 2005, Seghers and Kormanik entered into an agreement entitled "Contract of Employment and Power of Attorney." Seghers agreed to pay Kormanik a retainer of $25,000. Kormanik agreed to discounted hourly billing rates, and Seghers agreed to pay Kormanik, as additional fees, "2½ % of the proceeds of the sale, rent, lease or other disposition of the Tikar artwork now owned, or to be acquired by or through [Seghers]." Seghers paid Kormanik the $25,000 retainer, which the parties later orally agreed would simply be a flat fee.

### The Mbiam Lawsuit

In September 2005, Kormanik filed suit against Mbiam, a foreign national, and other defendants in a state district court in Bell County, Texas. The defendants in the Mbiam suit removed the case to federal court and moved to dismiss for lack of personal jurisdiction. Before the federal court ruled on the jurisdictional issue, the parties reached a settlement in which Mbiam agreed to return the art in exchange for a full and final release of any and all claims by Seghers related to the Tikar art. The settlement agreement, which was fully executed on April 17, 2006, was followed by a final judgment dismissing Seghers's claims with prejudice.

### Cameroon Trip

Before the settlement in the Mbiam lawsuit was finalized, Seghers asked Kormanik and others to accompany him to Cameroon to get physical control of the Tikar art collection. Kormanik proposed a flat fee of $25,000, plus expenses estimated to be an additional $25,000. Seghers ultimately agreed to pay Kormanik $50,000, out of which came Kormanik's fee and expenses. They made the trip and were successful in obtaining physical possession of the art.

### Conflicting Testimony as to what Happened after the Cameroon Trip

Witnesses presented conflicting testimony at trial as to what transpired after the

Cameroon trip. Kormanik testified as follows:

- Kormanik believed that his attorney-client relationship with Seghers ended "somewhere in the latter part of June of 2006." Kormanik did not send Seghers a letter terminating Kormanik's representation of Seghers.
- After their trip to Cameroon, Kormanik was willing to participate in helping make the Tikar art project successful.
- Kormanik had some discussions with Seghers about the need to market the Tikar art collection. Kormanik then had discussions with Seghers about appellant Michael D. Sydow.
- At least one month before July 8, 2006, Seghers and his wife met with Kormanik in Houston to discuss Seghers's desire to take further action against Mbiam. Kormanik explained the releases that Seghers had signed when the Mbiam lawsuit settled. Kormanik told Seghers that this "was likely a dead end," and Seghers did not pursue further action against Mbiam.
- Kormanik asked Seghers to send him $20,000. Seghers was not Kormanik's client when Kormanik received the June 30, 2006 check for $20,000. This $20,000 was not sent specifically for legal work, and Kormanik and Seghers "had not come to any agreement about what, if anything, [they] were going to do." Kormanik asked Seghers to send Kormanik $20,000 because Seghers knew Kormanik did not work for free and Kormanik was going to set aside his time to visit with him about the marketing plan.
- Seghers, Sydow, and Kormanik met in Houston on July 8, 2006, in Kormanik's office. This was the first time Seghers had met Sydow, and Kormanik introduced Sydow by name to Seghers. Seghers educated Sydow about the Tikar art. Before July 8, 2006, Kormanik received a check from Seghers for $20,000. On this date, Kormanik already had $20,000 of Seghers's money.
- The next day, at Seghers's suggestion, the trio went to Temple, Texas to look at the Tikar art there. After looking at the art, the trio went to Seghers's house in Temple. Seghers continued to educate Kormanik and Sydow about the Tikar art, and Seghers gave them about six books so that they could study the books in preparation to move the project forward.
- Sydow had an idea that it would be better if they could interest celebrities in the Tikar culture and try to convince them of Seghers's idea that this art "is going to change essentially the world." Sydow thought that the value of the Tikar art could be increased if celebrities brought the importance of this art to the public.
- On July 10, 2006, Seghers, Kormanik, and Sydow met again for hours in Kormanik's Houston office. They discussed a marketing plan with four phases.
- In Phase I the goal was to generate interest in Tikar culture among selected celebrities. They discussed the process by which they would be identifying, contacting, and educating "lead celebrities," including the renowned artist Michael Jackson, and the Jackson family. Sydow had represented Michael Jackson in various business dealings.
- In Phase II, there would be publicity regarding the Tikar art, and they

would seek celebrity endorsements and television and movie specials about the Tikar art.

- Phase III would be the negotiation of the acquisition of the art. Seghers was convinced that the value of the whole project to him after everyone else was paid would be at least $30 million.

- Phase IV would involve the exhibition of the Tikar art in museums and traveling exhibits.

- By the end of the meeting on July 10, 2006, Seghers, Kormanik, and Sydow came to a meeting of the minds that (1) Kormanik and Sydow would go forward with the marketing plan for the Tikar art; (2) Seghers would pay Kormanik and Sydow $350,000; and (3) Kormanik and Sydow would pay their own expenses, except that Seghers would pay their expenses relating to African academicians. The three men outlined the marketing plan on a white board.[1] They agreed that the $20,000 that Seghers already had paid Kormanik would count as the July 2006 payment, that Seghers would pay $110,000 right away, and then pay $20,000 each month until he had paid a total of $350,000.

- Seghers was excited and could not wait to get started. Seghers wrote a check for $110,000 to Kormanik and gave it to him on July 10, 2006. Kormanik asked Seghers to include Sydow as a payee, but Seghers did not do so. Kormanik does not remember seeing the words "attorney fees" on the memo line of the check.

Kormanik was not going to do any legal work on this marketing project, nor was Sydow. Kormanik and Sydow were only to market art.

Sydow stated he had no knowledge of Kormanik's prior dealings with Seghers. Sydow testified that there was a meeting of the minds on July 10, 2006, regarding the marketing plan[2] and that Seghers would pay a flat fee of $350,000, to be divided evenly between Kormanik and Sydow. Sydow testified that Seghers paid $110,000 on July 10, 2006, but Sydow did not recall being aware of the $20,000 payment in July 2006. According to Sydow's testimony, on July 10, 2006, Sydow believed that Seghers had paid $110,000 and would pay the remaining $240,000 by monthly installments of $20,000. Sydow testified that Kormanik and Sydow would pay their own expenses, except that Seghers would pay their expenses relating to African academicians. Sydow testified that this agreement did not involve any legal work at all and that Seghers expressly acknowledged that neither Kormanik nor Sydow would be performing any legal work.

Seghers testified, among other things, as follows:

- Seghers gave Kormanik the June 30, 2006 check for $20,000 to investigate and pursue action against Mbiam by Tikar, Inc. (hereinafter, "Tikar Foundation"), a nonprofit foundation established by Seghers, or to explore different options.

- The point of this action was to try to see if the $2.8 million that Mbiam had received from Seghers could be used to improve the local infrastruc-

1. A photograph of this white board was admitted into evidence.

2. During some parts of his trial testimony Sydow testified that he never agreed to market the Tikar art and that he agreed to educate certain celebrities about Tikar culture rather than to help Seghers sell this art.

ture in Cameroon rather than for Mbiam's personal benefit.

- Seghers stated that Kormanik was Seghers's attorney during the meeting on July 10, 2006, between Seghers, Kormanik, and Sydow.

- Though Seghers agreed that the three men discussed the plan outlined on the white board in Kormanik's office, Seghers denied that he entered into any agreement of any kind with Kormanik and Sydow on July 10, 2006. Seghers denied that he had made any deal with Kormanik or Sydow to market the Tikar art collection.

- Seghers gave Kormanik a check for $110,000 on July 10, 2006, and Seghers wrote "attorney fees" on the memo line of the check at that time.

Sydow testified that, during the three days after July 10, 2006, Sydow began reading materials that Seghers had provided, conducted independent research, and had several hours of conversations with Randy Jackson, Michael Jackson, and some of Michael Jackson's advisors about Tikar culture, Seghers's theories, and the significance of these theories.

Kormanik testified that during the evening of July 13, 2006, Seghers talked to Kormanik on the phone and told him that they had made a major error in judgment, Seghers did not "want to do this," and that Seghers wanted the $130,000 returned. Seghers sent an email to Kormanik the next day, saying essentially the same thing. Kormanik told Seghers that Sydow and Kormanik had made contacts and that they were getting ready to go to California and initiate Phase I of the marketing plan. Kormanik stated that he wanted to go forward.

### Suit by Kormanik and Sydow against Seghers

Shortly thereafter litigation ensued. After various procedural developments that are not relevant to this appeal, the parties found themselves in the trial court below, with Kormanik and Sydow as plaintiffs/counterdefendants, asserting breach-of-contract claims against defendant/counterplaintiff Seghers. Seghers asserted various defenses, and in his counterclaim, he asserted a breach-of-fiduciary duty claim against Kormanik. Seghers alleged that Sydow engaged in a conspiracy to breach Kormanik's fiduciary duty. The case was tried to a jury, which found in pertinent part as follows:

- Seghers, Kormanik, and Sydow agreed that Seghers would pay a fee of $350,000 in exchange for the implementation of a marketing plan.
- An attorney-client relationship existed between Kormanik and Seghers at the time of the agreement which extended to the negotiations and implementation of the agreement.
- Kormanik did not show that he complied with his fiduciary duty to Seghers.
- Zero dollars, if paid now in cash, would fairly and reasonably compensate Sydow for his damages, if any, that resulted from the failure to comply with the agreement.
- The sum of $130,000, if paid now in cash, would fairly and reasonably compensate Seghers for his damages, if any, that were proximately caused by Kormanik's breach of fiduciary duty.

The trial court denied the motion for judgment notwithstanding the verdict filed by Kormanik and Sydow. The trial court rendered a final judgment that Kormanik and Sydow take nothing and that Seghers recover $130,000 plus prejudgment inter-

est against Kormanik. Kormanik and Sydow filed a motion for new trial, which the trial court denied.

## II. Issues Presented

On appeal Kormanik and Sydow present three issues. In the first, they assert that the evidence is legally and factually insufficient to support the jury's finding that an attorney-client relationship existed between Kormanik and Seghers at the time of the marketing agreement. In their second issue, they assert that the evidence is legally and factually insufficient to support the jury's finding regarding breach of fiduciary duty. Under their third issue, Kormanik and Sydow assert that the evidence is legally insufficient to support the jury's answer to the damages question for Sydow's breach-of-contract claim.

## III. Standards of Review

When reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex.2005). We must credit favorable evidence if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *See id.* at 827. We must determine whether the evidence at trial would enable reasonable and fair-minded people to find the facts at issue. *See id.* Jurors are the sole judges of witness credibility and the weight to give to testimony. *See id.* at 819.

When reviewing a challenge to the factual sufficiency of the evidence, we examine the entire record, considering both the evidence in favor of, and contrary to, the challenged finding. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986). After considering and weighing all the evidence, we set aside the fact finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986). The jurors are the sole judges of the credibility of the witnesses and the weight to be given to their testimony. *GTE Mobilnet of S. Tex. v. Pascouet*, 61 S.W.3d 599, 615–16 (Tex.App.-Houston [14th Dist.] 2001, pet. denied). We may not substitute our own judgment for that of the jury, even if we would reach a different answer on the evidence. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex.1998). The amount of evidence necessary to affirm a judgment is far less than that necessary to reverse a judgment. *Pascouet*, 61 S.W.3d at 616.

## IV. Analysis

### A. Attorney–Client Relationship Between Kormanik and Seghers

In their first issue, Kormanik and Sydow argue that the evidence is legally and factually insufficient to support the jury's finding in response to Question 3 of the jury charge, in which the jury was asked about the nature of the relationship between Kormanik and Seghers. At the charge conference, no party asserted a valid objection to any defect in this question; therefore, we measure the sufficiency of the evidence against the standard in this question. *See Tractebel Energy Marketing, Inc. v. E.I. Du Pont De Nemours & Co.*, 118 S.W.3d 929, 932 (Tex.App.-Houston [14th Dist.] 2003, pet. denied). The jury found that an attorney-client relationship existed between Kormanik and Seghers at the time of the agreement which extended to the negotiations and implementation of the agreement. The trial court instructed the jury as follows:

An attorney[-]client relationship is a contractual relationship whereby an attorney agrees to render professional services. The relationship may be cre-

ated by contract or by the actions of the parties. There must be a meeting of the minds as to the relationship determined by an objective standard based upon what the parties said and did, not determined by the parties['] subjective state of mind.

In July 2005, Seghers and Kormanik entered into a written agreement establishing an attorney-client relationship. Under the unambiguous language of the written agreement, Seghers paid Kormanik a retainer of $25,000. This contract provided, "Client [Seghers] empowers the said Attorney [Kormanik] to take such actions and to file any legal actions as may be advisable in Attorney's judgment with respect to legal services rendered and to be rendered with regard to the Tikar Art Collection which is currently in Texas and Africa." Under the plain meaning of the written agreement, the $25,000 is a retainer that must be replenished, and Kormanik will bill Seghers at $250 per hour, even if these billings exceed $25,000.

Kormanik testified that he and Seghers orally agreed to change this agreement into a flat fee of $25,000 rather than a retainer and billings based upon the hours worked. Kormanik also testified that he orally agreed with Seghers to travel with Seghers to Cameroon and to be paid an additional flat fee of $25,000 for his services and another $25,000 for expenses.

After returning from Cameroon in February 2006, Kormanik continued to render legal services to Seghers regarding the Mbiam lawsuit. In April 2006, the releases were executed. According to a document Kormanik prepared, Kormanik reviewed documents relating to the dismissal of the Mbiam lawsuit on June 5, 2006. Kormanik testified that his attorney-client relationship with Seghers ended "somewhere in the latter part of June of 2006." Kormanik testified that he asked Seghers to send him $20,000, and the evidence contains emails reflecting that Kormanik requested this $20,000 on or before June 22, 2006. Kormanik admitted that he did not send Seghers any letter terminating his legal representation of Seghers. Kormanik claimed that the $20,000 was not sent specifically for legal work, and that Kormanik and Seghers "had not come to any agreement about what, if anything, [they] were going to do." Kormanik also contended that he asked Seghers to send him $20,000 because Seghers knew Kormanik did not work for free and Kormanik was going to set aside his time to visit with Seghers about the marketing plan. Sydow did not recall being aware of this $20,000 payment from Seghers to Kormanik in July 2006.

Before the July 8, 2006 meeting began, Kormanik had cashed the June 30, 2006 check for $20,000. The meetings on July 8 and July 10, 2006 occurred in Kormanik's Houston law office. Seghers testified that on July 10, 2006, he gave Kormanik the check for $110,000, after Seghers placed the notation "attorney fees" on the check. A document in evidence supports Seghers's testimony in this regard, and Kormanik has no recollection as to whether the notation was on the check when he received it and cashed it. Seghers stated that Kormanik was Seghers's attorney during the meeting on July 10, 2006, attended by Seghers, Kormanik, and Sydow.

Seghers testified that he gave Kormanik the June 30, 2006 check to investigate and pursue action against Mbiam by the Tikar Foundation or to explore different options. According to Seghers, the point of this action was to try to see if the $2.8 million that Mbiam had received could be used to improve the local infrastructure in Cameroon rather than for Mbiam's personal benefit. Kormanik and Seghers argue that Seghers' testimony in this regard can-

not possibly be true based on the release in the Mbiam lawsuit. In this release, Seghers (1) stated that he was the sole and exclusive owner of the claims in that case and that no assignment had been made of any portion of these claims to any person, firm, or corporation, and (2) released Mbiam from any and all claims which arose in any manner from any transaction by and between Seghers and Mbiam with regard to the Tikar art. But this release in no way precludes Kormanik from acting as Seghers's attorney in the investigation of a potential action against Mbiam by the Tikar Foundation or in the exploration of different options. Further, presuming for the sake of argument that any suit by the Tikar Foundation against Mbiam would be dismissed on summary judgment based on the release, Kormanik still could retain an attorney to investigate the possibility of filing such a lawsuit.

On its face, the June 30, 2006 check does not indicate whether it comes from a Tikar Foundation account or from a Seghers account. Some evidence indicates that the June 30, 2006 check came from a Tikar Foundation bank account.[3] Other evidence, including Kormanik's testimony, indicates that this check came from Seghers's funds. The jury reasonably could have credited the evidence indicating that this $20,000 came from Seghers's funds. In any event, even if the jury concluded that these funds came from a Tikar Foundation account, this would not mean that any attorney-client relationship relating to these funds would have to be between Kormanik and the Tikar Foundation. *See Roberts v. Healey*, 991 S.W.2d 873, 880–81 (Tex.App.-Houston [14th Dist.] 1999, pet. denied).

Emails that, according to Kormanik, related to the negotiation or implementation of the marketing plan state that they were sent by Kormanik acting on behalf of his professional corporation. Kormanik testified that, for most of his career, he has been a personal injury lawyer, that he was not a business lawyer, and that he knows nothing about marketing art. The jury impliedly did not credit Seghers's testimony that there was no agreement regarding the marketing plan, and there were inconsistencies and contradictions in Seghers's testimony. Nonetheless, the jury still was free to credit the parts of Seghers's testimony showing that an attorney-client relationship existed between Kormanik and Seghers during the negotiation and implementation of this agreement. As factfinder, the jury had the prerogative to believe one witness and disbelieve another, to believe some parts of a witnesses's testimony and disbelieve other parts, and to resolve inconsistencies in any witnesses' testimony. *See Duruji v. Duruji*, 2007 WL 582282, at *5 (Tex.App.-Houston [14th Dist.] Feb. 27, 2007, no pet.) (mem. op.).

The record contains evidence that would allow reasonable jurors to conclude that there was a meeting of the minds between Kormanik and Seghers based on what the parties said and did. There is evidence that (1) Kormanik and Seghers discussed a second action against Mbiam; (2) Seghers gave Kormanik the June 30, 2006 check to investigate and pursue action against Mbiam by the Tikar Foundation or to explore different options; (3) Kormanik asked Seghers to send Kormanik $20,000, (4) Kormanik cashed the $20,000 check before July 8, 2006; and (5) Kormanik cashed the July 10, 2006 check with the

---

**3.** In a June 22, 2006 email, Seghers states "I sent a check to fund Tikar Foundation today with instructions to send you a 20,000 US$ check." This email indicates that the check was drawn on a Tikar Foundation account after Seghers gave the Foundation $20,000 to fund the payment of the check.

notation "attorney fees" on it. The evidence is conflicting regarding whether an attorney-client relationship existed between Seghers and Kormanik during the negotiation and implementation of the marketing agreement. As the sole judges of the credibility of the witnesses and the weight to be given to their testimony, the jury was free to make this determination. *See Pascouet,* 61 S.W.3d at 615–16.

■ Considering the evidence in the light most favorable to the challenged finding, indulging every reasonable inference that would support it, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not, we conclude that the trial evidence would enable reasonable and fair-minded people to find that an attorney-client relationship existed between Kormanik and Seghers in response to Question 3 in the jury charge. See *City of Keller,* 168 S.W.3d at 823, 827; *Bright v. Addison,* 171 S.W.3d 588, 596–97 (Tex. App.-Dallas 2005, pet. denied) (concluding evidence was legally and factually sufficient to support finding that attorney-client relationship existed). Examining the entire record, considering both the evidence in favor of, and contrary to, the challenged finding, and considering and weighing all the evidence, we conclude that the jury's answer to Question 3 is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.[4] *See Pool,* 715 S.W.2d at 635; *Bright,* 171 S.W.3d at 596–97. Accordingly, we overrule Kormanik and Sydow's first issue.

## B. Breach of Fiduciary Duty

In their second issue, Kormanik and Seghers argue that the evidence is legally and factually insufficient to support the jury's finding in response to Question 4 of the jury charge relating to Kormanik's compliance with his fiduciary duty. At the charge conference, no party asserted a valid objection to any defect in this question; therefore, we measure the sufficiency of the evidence against the standard in this question. *See Tractebel Energy Marketing, Inc.,* 118 S.W.3d at 932. In its answer to Question 4, the jury found that Kormanik did not show he complied with his fiduciary duty to Seghers. The trial court instructed the jury that, to show he complied with his fiduciary duty, Kormanik had to establish each of the following:

a. The transaction pertaining to marketing was fair and equitable to [Seghers]; ·

b. [Kormanik] made reasonable use of the confidence that [Seghers] placed in him;

c. [Kormanik] acted in the utmost good faith and exercised the most scrupulous honesty toward [Seghers];

d. [Kormanik] placed the interests of [Seghers] before his own, did not use the advantage of his position to gain any benefit for himself at the expense of [Seghers], and did not place himself in any position where his self-interest might conflict with his obligations as a fiduciary; and

e. [Kormanik] fully and fairly disclosed all important information to [Seghers] concerning the transaction.

Sydow testified that, under the agreement with Seghers, Sydow would discuss Seghers's theories about Tikar culture and art with Sydow's "clients on the West Coast" to see if Sydow could generate

---

4. Seghers contends that Kormanik and Sydow failed to preserve error in the trial court regarding this factual-sufficiency challenge. Kormanik and Sydow argue that they did preserve error. We presume, for the sake of argument, that Kormanik and Sydow adequately preserved this complaint. Even so, we conclude that this complaint lacks merit.

interest in these topics. According to Sydow, the idea was to generate interest among these clients, which would dramatically enhance the value and importance of the Tikar art collection. Sydow testified that he had no obligation under the agreement to assist Seghers in selling Tikar art to Sydow's clients. Sydow testified that Kormanik was to help Sydow in his efforts and that Seghers was to pay each of them a $175,000 flat fee that was not dependent upon the amount of hours worked or the success of the efforts. According to Sydow, Kormanik would do whatever Sydow asked him to do to assist in these efforts. Sydow stated that Kormanik was going to (1) educate himself about Seghers's theories regarding Tikar culture, (2) assist in identifying African academicians who were going to meet with Sydow's West Coast clients, if these clients were interested, (3) prepare the academicians to discuss the Tikar culture and Seghers's theories with these clients, and (4) assist in setting up the meetings and receptions.

■ Based upon the trial evidence, the jury reasonably could have found that, under the July 10, 2006 agreement, Kormanik, who knew nothing about marketing art, would receive $175,000 in guaranteed compensation, not dependent on the amount of hours worked or the success of the efforts. Kormanik would receive this compensation for assisting Sydow in his efforts to educate his West Coast clients about Seghers's theories about Tikar culture and art and to generate interest in this subject with these clients. Given the lack of specificity as to what services Kormanik would be providing, the lack of any minimum number of hours that Kormanik needed to work, and the lack of any requirement that Kormanik achieve any benchmark of suc-

cess, the jury reasonably could have found that Kormanik failed to prove that the transaction pertaining to marketing was fair and equitable to Seghers or that Kormanik placed Seghers's interests before his own. *See Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co.,* 20 S.W.3d 692, 699 (Tex.2000) (holding that law firm did not prove as a matter of law that agreement it negotiated with one of its clients was fair and reasonable). Under the applicable standards of review, we conclude that the evidence is legally and factually sufficient to support the jury's finding that Kormanik did not make the showing required under Question 4.[5] *See id.* Accordingly, we overrule Kormanik and Sydow's second issue.

## C. Sydow's Breach–of–Contract Damages

Under their third issue, Kormanik and Sydow argue that the evidence is legally insufficient to support the jury's answer to Question 5, the damages question for Sydow's breach-of-contract claim against Seghers. Because no party asserted a valid objection to any defect in this question at the charge conference, we measure the sufficiency of the evidence against the standard set forth in this question. *See Tractebel Energy Marketing, Inc.,* 118 S.W.3d at 932. The jury was asked "[w]hat sum of money, if any, if paid now in cash, would fairly and reasonably compensate [Sydow] for his damages, if any, that resulted from the failure to comply with the agreement?" The trial court instructed the jury to consider only the benefit-of-the-bargain measure of damages, which the trial court defined as follows: "[t]he difference between the agreed price and the cost [Sydow] would have incurred in fulfilling the marketing plan." The jury

5. We presume, for the sake of argument, that Kormanik and Sydow adequately preserved this factual-sufficiency challenge. But, in any

event, we conclude that this challenge lacks merit.

answered "$0.00 (none)." In this context, the proper interpretation of the jury's answer is that the jury found Sydow did not prove by a preponderance of evidence that he sustained any damages under the measure of damages submitted by the trial court. *See Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989); *C. & R. Transport, Inc. v. Campbell*, 406 S.W.2d 191, 194 (Tex.1966); *Gant v. Dumas Glass & Mirror, Inc.*, 935 S.W.2d 202, 209 (Tex. App.-Amarillo 1996, no writ); *Am. Recreational Markets Gen. Agency v. Hawkins*, 846 S.W.2d 476, 478 (Tex.App.-Houston [14th Dist.] 1993, no writ).

■ Kormanik and Sydow argue that the evidence conclusively proves that Sydow's contract damages were $220,000 based on the uncontroverted liquidated amounts relating to the agreement. Presuming for the sake of argument that the evidence conclusively proved that Seghers was supposed to pay a flat fee of $350,000 to Sydow under the agreement and that Seghers is entitled to a credit of $130,000,[6] this would not constitute conclusive proof of Sydow's damages under Question 5. Under the measure of damages in that question the jury still would have to subtract from that amount the costs that Sydow would have incurred had he fully performed under the agreement. *See Clear Lake City Water Auth. v. Friendswood Dev. Co.*, 344 S.W.3d 514, 522 (Tex.App.-Houston [14th Dist.] 2011, no pet. h.) (stating that "[t]he purpose of the benefit-of-the-bargain measure of damages is to restore the injured party to the economic position it would have been in had the contract been fully performed"); *Data Foundry, Inc. v. Silicon Integration Initiative, Inc.*, 2010 WL 2336464, at *3 (Tex. App.-Austin June 11, 2010, no pet.) (mem. op.). Under the applicable standards of review, the evidence is legally sufficient to support a jury finding that Sydow did not prove by a preponderance of the evidence the costs he would have incurred had he been able to fulfill the marketing plan. In fact, the record contains no evidence of the amount of these costs.

The record contains testimony that Kormanik and Sydow were planning a trip to California to talk to some of Sydow's clients regarding the Tikar art, and both Sydow and Kormanik agreed that they would have had to pay the costs of talking to and visiting Sydow's clients.[7] Under the applicable standard of review, the evidence is legally sufficient to support the jury's answer to Question 5 and its finding that Sydow did not prove by a preponderance of evidence that he sustained any damages under the measure of damages submitted by the trial court. *See Data Foundry, Inc.*, 2010 WL 2336464, at *3 (holding that company did not conclusively prove benefit-of-the-bargain damages and that factfinder appropriately did not find any damages because company did not offer any evidence of the costs or losses it avoided by not having to fully perform); *Gant*, 935 S.W.2d at 209 (holding that the evidence supported jury's finding, by its zero damages award, that plaintiff did not meet its burden of proving the damages in

---

6. Some evidence at trial indicated that Seghers was supposed to pay $350,000 to Sydow, who then would pay half of this fee to Kormanik. Other evidence suggests that Seghers was supposed to pay each man $175,000. The two payments in question were made only to Kormanik.

7. Sydow testified that the only costs he incurred in the few days he was working on this matter were long distance phone charges for calls to his clients. But Sydow did not testify as to the amount of these costs, and, in any event, the measure of damages in this case is the benefit of the bargain, not reliance damages. *See Clear Lake City Water Auth.*, 344 S.W.3d at 523.

question). Moreover, because Sydow did not recover on his contract claim, he cannot recover attorney's fees under Chapter 38 of the Civil Practice and Remedies Code.[8] *See MBM Fin. Corp. v. The Woodlands Operating Co.,* 292 S.W.3d 660, 666 (Tex.2009). Accordingly, we overrule Kormanik and Sydow's third issue.[9]

## V. Conclusion

The evidence is legally and factually sufficient to support the jury's findings that an attorney-client relationship existed between Kormanik and Seghers at the time of the marketing agreement and that Kormanik did not make the showing required to prove that he complied with his fiduciary duty. The evidence is legally sufficient to support the jury's finding that Sydow did not prove by a preponderance of evidence that he sustained any contract damages. Accordingly, we affirm the trial court's judgment.

## SUPPLEMENTAL OPINION

### KEM THOMPSON FROST, Justice.

We issue this supplemental opinion to address a jurisdictional issue that appellants Ronald J. Kormanik and Michael D. Sydow have raised for the first time on rehearing. Concluding that this jurisdictional issue and the other issues raised on rehearing lack merit, we overrule the motion for rehearing.

### Background

Kormanik and Sydow originally filed this suit against appellee/defendant Victor Seghers in the County Court at Law Number One in Harris County. Seghers filed a motion to dismiss for lack of subject-matter jurisdiction, arguing that the county court at law lacked jurisdiction because the matter in controversy exceeded $100,000, excluding interest, statutory or punitive damages and penalties, and attorney's fees and costs, as alleged on the face of the petition. *See* Tex. Gov't Code Ann. §§ 25.0003(c)(1), 25.1032(a) (West 2011). Kormanik and Sydow disagreed and argued that the county court at law had subject-matter jurisdiction.[1]

The county court at law transferred the case to the district court. The case was initially pending in the 189th District Court of Harris County but later was transferred to the 190th District Court of Harris County. Following a jury trial, the presiding judge of the 190th District Court signed a final judgment that Kormanik and Sydow take nothing and that Seghers recover $130,000 plus prejudgment interest against Kormanik. Kormanik and Sydow appealed the trial court's judgment to this court. On original submission, Kormanik and Sydow did not challenge the jurisdiction of the trial court, nor did they challenge the jurisdiction of this court. In their opening appellate brief, Kormanik and Sydow stated that "the procedural history of this case is rather complicated, but

8. Kormanik also argues that, if this court sustains his first or second issue, then he should be able to recover under the agreement. We have not sustained either issue and, in any event, Kormanik could not show that he conclusively proved his contract damages for the same reasons discussed in this section.

9. We need not and do not address Seghers's argument that Sydow cannot recover on his contract claim because the agreement was a product of Kormanik's breach of fiduciary duty.

1. At this juncture, Kormanik and Sydow were represented by different counsel than the counsel that represented them at trial in the district court and on appeal in this court.

ultimately not pertinent to the issues on appeal."

After this court affirmed the trial court's judgment, Kormanik and Sydow filed a motion for rehearing asserting for the first time that the trial court's judgment is void because the trial court lacked subject-matter jurisdiction. Kormanik and Sydow now argue that the county court at law lacked subject-matter jurisdiction over the original petition that they filed in that court. Because the county court at law lacked subject-matter jurisdiction, Kormanik and Sydow assert, the county court was required to dismiss the case and had no authority to transfer the case to the district court. Even though the district court would have had subject-matter jurisdiction over the case under review if the case had been originally filed in that court, Kormanik and Sydow argue that the county court at law's purported lack of subject-matter jurisdiction deprived the district court of jurisdiction over the transferred case, making the district court's judgment void.

### Analysis of Jurisdictional Issue

■ To determine whether the county court at law had subject-matter jurisdiction over this suit, we need to review the allegations made by Kormanik and Sydow in the original petition that they filed in the county court. *See Continental Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 449 (Tex.1996); *Weidner v. Sanchez,* 14 S.W.3d 353, 360–61 (Tex.App.-Houston [14th Dist.] 2000, no pet.). We are unable to review this original petition because it is not in our appellate record. Nonetheless, we presume, without deciding, that under this original petition, the county court at law lacked subject-matter jurisdiction over the case under review.

As has been pointed out by three justices of the Supreme Court of Texas, "the jurisdictional structure of the Texas court system is unimaginably abstruse" and "has gone from elaborate ... to Byzantine." *See Sultan v. Mathew,* 178 S.W.3d 747, 753 (Tex.2005) (Hecht, J., dissenting, joined by Wainwright and Medina, JJ.). Various Texas statutes provide for transfer of a case from one trial court to another when the court in which the case was filed lacks subject-matter jurisdiction. *See, e.g.,* Tex. Prop.Code Ann. § 21.002 (West 2011) (providing for transfer of eminent-domain case from a county court at law to a district court when the case involves an issue of title); Tex.Code Crim. Proc. Ann. art. 21.26 (West 2009) (providing for transfer of criminal case from district court to an inferior court if the district court lacks jurisdiction over the offense charged in the indictment filed in the district court). The statute governing the transfer from the county court at law to the district court in the case under review requires that the district court have subject-matter jurisdiction over the transferred case but does not require that the county court at law have subject-matter jurisdiction over the transferred case. *See* Tex. Gov't Code Ann. § 74.121(b)(1) (West 2011); *The Cadle Co. v. Bray,* 264 S.W.3d 205, 212–13 (Tex.App.-Houston [1st Dist.] 2008, pet. denied) (making same observation about substantially similar language in Government Code section 74.121(a)). The Supreme Court of Texas has indicated that a proper basis for transferring a civil case from one court to another may be the lack of subject-matter jurisdiction in the transferor court. *See Texas Employers' Ass'n v. Cashion,* 130 S.W.2d 1112, 1113–14 (Tex. Civ.App.-Dallas 1939, writ ref'd) (basing holding upon statement from an intermediate court that a proper reason for transferring a case from one trial court to another is a lack of jurisdiction in the transferor

court in which the case was filed).[2] *See also The Cadle Co.*, 264 S.W.3d at 212–13 (concluding that case was properly transferred under Government Code section 74.121(a) from trial court lacking subject-matter jurisdiction to trial court that had subject-matter jurisdiction); *Park v. Western Union Financial Servs., Inc.*, No. 03–08–00292–CV, 2009 WL 3486373, at *2 (Tex.App.-Austin Oct.30, 2009, no pet.) (concluding that trial court had jurisdiction over case, even though it was originally filed in a court that lacked subject-matter jurisdiction, because the case was transferred under Government Code section 74.121(a) to a court that had subject-matter jurisdiction) (mem.op.). Though the judge of a county court at law may transfer a case under Texas Government Code section 74.121(b)(1) for any number of reasons, one reason might be lack of subject-matter jurisdiction over the case in the county court at law and subject-matter jurisdiction over the case in the district court. *See In re Owens*, No. 06–08–00101–CV, 2008 WL 4329218, at *1 (Tex.App.-Texarkana Sept.24, 2008, orig. proceeding) (denying writ of prohibition seeking to prevent district court from exercising jurisdiction over case transferred to district court from county court at law under Government Code section 74.121(b)(1) because the county court lacked subject-matter jurisdiction over the case) (mem.op.).

 Generally, a trial court that lacks subject-matter jurisdiction over a case must dismiss it. But, if another court would have subject-matter jurisdiction over the case and the case may be transferred to that court under a Texas statute, then the trial court may transfer the case to the court having jurisdiction rather than dismiss the case. *See Cashion*, 130 S.W.2d at 1113–14; *The Cadle Co.*, 264 S.W.3d at 212–13; *Park*, 2009 WL 3486376, at *2; *In re Owens*, 2008 WL 4329218, at *1. Kormanik and Sydow cite various cases in which courts state that a court lacking jurisdiction must dismiss the case. But these cases did not involve suits that were transferred from a trial court lacking jurisdiction to a trial court that had jurisdiction. In addition, the cases upon which Kormanik and Sydow rely do not state that a trial court lacking jurisdiction cannot transfer the case to a trial court that has jurisdiction. In any event, the Supreme Court of Texas has quoted with approval language equating such a transfer with the dismissal of the case and the filing of a new case in the court that has jurisdiction. *See Cashion*, 130 S.W.2d at 1114. Even if the county court at law lacked subject-matter jurisdiction over this case, the judge of that court had the authority to transfer the case to the district court under Government Code section 74.121(b)(1). *See* Tex. Gov't Code Ann. § 74.121(b)(1); *In re Owens*, 2008 WL 4329218, at *1. The county court at law had the power to transfer cases over which it lacked jurisdiction, and the case under review was within the subject-matter jurisdiction of the district court to which the case was transferred. Therefore, any lack of subject-matter jurisdiction in the county court at law would not deprive the district court of subject-matter jurisdiction and would not make the district court's judgment void. We conclude the district court's judgment is not void.

We overrule the jurisdictional issue raised by Kormanik and Sydow in their

2. In cases decided after June 14, 1927, the Supreme Court of Texas's notation of "writ refused" or "petition refused" denotes that the court of appeals's opinion is the same as a precedent of the Supreme Court of Texas. *See Yancy v. United Surgical Partners Int'l, Inc.*, 236 S.W.3d 778, 786 n. 6 (Tex.2007).

motion for rehearing.[3] Because the other issues raised in this motion lack merit, we overrule the motion.

ANDERSON, J., not participating on rehearing.

---

**3.** In their rehearing motion, Kormanik and Sydow also suggest that the district court may have lacked jurisdiction or the transfer may have been improper because another case involving the same subject matter was pending in a district court in Bell County. But the pendency of such a case would not make transfer improper under Government Code section 74.121(b)(1), nor would the pendency of such a case affect the subject-matter jurisdiction of either the county court at law or the district court in Harris County. *See* Tex. Gov't Code Ann. § 74.121(b)(1); *Gammill v. Gammill*, No. 14–07–01013–CV, 2009 WL 1660479, at *2 (Tex.App.-Houston [14th Dist.] Jun. 16, 2009, no pet.) (mem.op.).