**WPS, INC., Appellant,**

**v.**

**EXPRO AMERICAS, LLC, Appellee.**

**Surface Production Systems, Inc., Cross–Appellant,**

**v.**

**WPS, Inc., Cross–Appellee.**

**No. 01–10–00041–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

Jan. 31, 2012.

Rehearing Overruled May 29, 2012.

Andrew Todd McKinney IV, Valarie J. Eissler, McKinney & Cooper, L.L.P., Houston, TX, for Appellant.

Patricia Hair, Phelps Dunbar, LLP, Houston, TX, for Appellee.

Panel consists of Justices JENNINGS, HIGLEY, and BROWN.

## OPINION

TERRY JENNINGS, Justice.

Appellant/cross-appellee, WPS, Inc. ("WPS"), challenges the trial court's take-nothing judgment, entered after a jury trial, against it and in favor of appellee, Expro Americas, LLC ("Expro Americas"), in WPS's suit against Expro Americas and its subsidiary, appellee/cross-appellant, Surface Production Systems, Inc. ("SPS"), for breach of contract, quantum meruit, and promissory estoppel. In its sole issue, WPS contends that the trial court erred in granting Expro Americas judgment notwithstanding the verdict on the ground that there is no evidence supporting the jury's findings against Expro Americas.

Expro Americas, in its cross-points,[1] challenges the jury's findings made against it, and it joins SPS, in SPS's cross-appeal, challenging the trial court's judgment entered against SPS on WPS's claims. In eight issues, Expro Americas and SPS contend that there is no evidence that there was an enforceable contract between them and WPS for the purchase of specially made equipment, Expro Americas and SPS's requirement in its purchase orders that they first issue a "release to proceed" before WPS was to make the "specialized equipment" rendered any promise "illusory," the requirement of the issuance of a "release to proceed" constituted a "condition precedent," the "progress payment and cancellation charges" awarded to WPS by the jury are not legally recoverable damages on WPS's breach-of-contract claim, the trial court erred "in commenting on the evidence and erroneously instructing the jury as to contract interpretation," there is no evidence to support WPS's quantum meruit or promissory estoppel claims, and the trial court erred in not admitting into evidence Expro Americas and SPS's pretrial offers to WPS to "pay cancellation charges."

---

1. *See* TEX.R.APP. P. 38.2(b)(1).

We reverse the trial court's judgment notwithstanding the verdict in favor of Expro Americas, and we render judgment in favor of WPS on its claims against Expro Americas. We affirm the remaining portions of the judgment.

## Factual and Procedural Background

In early 2006, SPS, a wholly-owned subsidiary of Expro Americas, was involved in negotiations with Conoco Venezuela to work on the development of an oil and gas field in Venezuela. In furtherance of this proposed development, SPS solicited WPS, which was in the business of making gas compressors, for a proposal to construct three gas injection compressor packages to be installed at an offshore Interim Production Facility (the "IPF") for the temporary processing of crude oil.

Following preliminary negotiations between the parties, Tom Caime, WPS's engineering supervisor, submitted to SPS on April 10, 2006 a proposal for the delivery of three gas compressor packages with a total net price of $4,143,066 and an estimated "ship date" of "20–22 weeks after order acceptance by an officer of WPS." Caime set forth detailed "terms of payment" with 10% of the purchase price due "[u]pon WPS['s] acceptance of order," a cancellation charge of "2% of contract value" if the order was cancelled "within 30 calendar days," and separate charges payable to certain providers of component parts, including $27,000 for Reliance, the proposed supplier of the motors, and $107,000 for Dresser–Rand, the proposed supplier of the compressors. Caime noted that WPS's proposal was subject to its "standard terms and conditions of sale," which he attached, and the "Crine/Logic terms and conditions," which had been previously provided to WPS by SPS, were "currently under review."

On April 11, 2006, Kevin Galvin, SPS's vice president, sent WPS a letter expressing "Expro's" "intent to issue a Purchase Order" for the three injection compressors for a total price of $4,143,066, but requiring that delivery be "on or before September 5, 2006." In regard to "[p]ayment [t]erms," Galvin provided that $217,361 would be paid "on submittal of mechanical installation drawings" and 10% would be paid upon obtaining a "Release to Proceed (to be before [May 11, 2006])." Galvin noted that terms and conditions were "to be agreed" upon and a "[c]onfirming [p]urchase [o]rder" would be issued "on or before ... April 17, 2006."

On April 12, 2006, Caime, in response to "Expro's" "letter of intent," sent Galvin a reply e-mail stating that WPS needed an "immediate Release to Proceed" before it could begin work and "order the critical equipment without which the price and delivery of our supply will be extended." Caime noted that "any delay in the purchase" would cause "the supply of [the] packages [to] suffer," WPS could not order equipment without the Release to Proceed, and it could not "proceed very far with engineering and design without vendor drawings, studies, and data that are not forthcoming without our purchase of that equipment." Caime explained that the Dresser–Rand compressor price that WPS used in its proposal was set to expire the next day, a price increase would apply afterwards, and other "vendor proposals" would also expire before the "suggested [May 11] date." Caime requested other "modifications" to the letter of intent, including a shipping date calculated 20 to 22 weeks from acceptance of "written" and "firm" purchase order, "cancellation charges as noted in [WPS's] proposal," and terms of payment of 10% "with purchase order" and 10% on submittal of "approval drawings." Caime requested an agree-

ment "today," so that WPS could place equipment orders the following day.

On April 12, 2006, Galvin, in a reply e-mail to Caime, stated that WPS was "released to proceed on the order subject to" the conditions that "[i]f [the] order [is] cancelled on or before May 11, 2006, ... Expro's financial liability is the cancellation charges per your proposal" and the terms and conditions "need to be agreed for the [purchase order]." Galvin agreed to "incorporate [WPS's] payment terms into the [purchase order]" and noted that he "plan[ned] to issue" the purchase order the next day, but was "waiting" on "approval." Caime immediately responded with an e-mail stating that WPS would "await [SPS's] purchase order tomorrow" and "order the capital equipment immediately thereafter."

Also on April 12, 2006, Griselda Ibarra, a SPS business analyst, sent Caime an e-mail with an attached purchase order (the "first purchase order"). She stated that the first purchase order was being provided "to proceed with the purchase of the [g]as [i]njection [c]ompressors." The first purchase order provided for a delivery date of September 12, 2006, a total net price of $4,143,066 for the purchase of three gas injection compressor packages, a "[d]eposit to secure the delivery of the specified equipment in order to meet the Project schedule" in the amount of $414,307 (10% of the total purchase price) that would be payable "[u]pon [a]cceptance of this [o]rder," and the payment of another 10% "[u]pon submittal of [d]rawings and Release to Proceed (to be on or before [May 8, 2006])." It further provided that the order would be "subject to mutual agreement of [t]erms and [c]onditions between WPS and Expro" and "valid until [May 8, 2006] unless Expro issue[d] a revised [p]urchase [o]rder to proceed."

On April 13, 2006, Tom Sawyer, responding by e-mail to Galvin on behalf of WPS regarding the first purchase order, explained that WPS could not accept the first purchase order "in its present form and content" and the parties "must resolve these issues today before 2:00 p.m. or risk missing the deadline for the Dresser–Rand price increase." Sawyer also forwarded Galvin an e-mail from Caime wherein he provided more detail about WPS's concerns. In this e-mail, Caime noted that the delivery date should instead be September 14, 2006 (22 weeks from April 13, 2006); the "order amount" was insufficient in that it covered only 10% of the order value and did not "cover the cost of the equipment"; and the first purchase order provided for the payment of the "second 10%" "only after" WPS received a release to proceed, which would not allow WPS to "get paid for the drawings." Caime further noted that the first purchase order was set to "expire[]" on May 8th" and contained "no specific mention of cancellation charges." Caime explained that WPS would "have to order a lot of material before May 8, [2006]" to satisfy the purchase order and comply with the delivery date and there would "be other charges from vendors that [would] also apply." Caime stated that WPS needed to obtain an agreement "today" before WPS ordered the motors and compressors, the purchase order "ha[d] to be for the full amount of $4,143,066," and WPS "ha[d] to have a full release subject to the cancellation charges stated in [WPS's] proposal and other [substantiated] costs." Caime explained that WPS needed these agreements "today," otherwise, WPS would have to wait until May 8th and "rebid this thing to SPS."

However, later that same day, Caime, in regard to the first purchase order, sent Ibarra another e-mail stating that the first purchase order was "limited to the purchase of the gas compressors," it was "ac-

ceptable for that purpose alone," and WPS would "order the compressors today." [2] He noted that the "Dresser–Rand compressor order is subject to cancellation charges in accordance with their published schedule." Caime explained that Sawyer had already responded with other comments on the remainder of the first purchase order and WPS would need a "full 'release to proceed' prior to determining a project schedule, detailed engineering, procurement, milestones or a commitment on delivery of the packages." He noted that the "project start date is tied to the 'release to proceed' date and acceptance of the purchase order," which WPS "hope[d] to accomplish ... early next week." Caime copied Galvin and Waldemar Finol, the SPS project engineer, on this e-mail. There is no evidence that any representative at SPS otherwise instructed WPS to withhold ordering the compressors.[3] Following Caime's e-mail, WPS ordered the compressors from Dresser–Rand, and, on April 17, 2006, WPS ordered motors from Reliance Electric.

Also on April 17, 2006, Sawyer sent Galvin an e-mail stating that WPS expected to receive a revised purchase order with a "full release to proceed." On April 18, 2006, Ibarra sent Caime a revised purchase order (the "second purchase order"), which contained the revisions concerning the price and the cancellation fees, but retained a delivery date of September 12, 2006 and the total price of $4,143,066. The second purchase order further stated that "Expro's liability for cancellation of the order on or before [May 8, 2006] [would

be] $217,361.32," it would be subject to mutual agreement to terms and conditions, $414,307 (10% of the total price) would be payable "[u]pon [a]cceptance of this [o]rder," another 10% would be payable "[u]pon submittal of [d]rawings and Release to Proceed (to be on or before [May 8, 2006]," and it would be "valid until [May 8, 2006] unless Expro issue[d] a revised Purchase Order to proceed."

On April 18, 2006, Caime circulated the second purchase order to others at WPS, noting that there were "still problems" regarding the May 8, 2006 "cessation date" and the "limitation of charges for cancellation." He explained that if the order was "acceptable today," the delivery date should instead be September 19, 2006. Detailing the cancellation charges that would be calculated on May 8, 2006 from Dresser–Rand, Reliance, and WPS, which totaled $189,449, Caime noted that the proposed cancellation liability of $217,361 was "not enough." He explained that this would "not cover" WPS for "coolers, valves, pipe, studies, etc." if WPS was to "proceed diligently from this point," but it "would be OK if [WPS] only did engineering and no further procurement until" obtaining a full release. If that were the case, a delivery date would have to be calculated after May 8, 2006. Caime concluded that if WPS "act[ed] towards a September delivery then [WPS] need[ed] a statement that 'all valid costs associated with cancellation will be to [SPS's] account,' or [WPS] should do only engineering until the release date." [4]

---

2. An internal WPS e-mail from Tom Caime acknowledged that the first purchase order had "some problems," but he stated that Seth Williamson, WPS's President, wanted to "make a conditional acceptance and get the Dresser–Rand compressors on order" that day.

3. WPS introduced into evidence an internal e-mail from Caime to Sawyer. In this email, Caime noted that Galvin had told him that SPS would revise the purchase order to include the "full project amount" and the "full release to proceed."

4. SPS introduced into evidence an internal WPS e-mail from Sawyer to Caime. In the e-

On April 20, 2006, Caime sent Ibarra an e-mail with an attached "conditional acceptance," and he requested SPS's "further addendum" by April 28, 2006. He stated, "We are proceeding from today basis [sic] a full release in anticipation of your agreement to the changes we request to your purchase order." Caime noted that the "current schedule is [September 21] for all three packages to be ready to ship." The attached "order acceptance form" identified four "order deviations" in regard to SPS's second purchase order. First, WPS noted that a revised purchase order should reflect a delivery date of September 21, 2006, not September 12, 2006. Second, WPS noted that the revised purchase order should provide that "Purchaser gives his full release to proceed and will pay all valid costs associated with any order cancellation." Third, WPS noted that the phrase "and Release to Proceed (to be on or before [May 8, 2006]" needed to be stricken from the revised purchase order. And fourth, WPS noted that the statement that the purchase order would be valid until May 8, 2006 unless "Expro" issued a revised purchase order to proceed needed to be "stricken in its entirety." In regard to all deviations, WPS stated that the "[o]rder is conditionally accepted pending Purchaser's acceptance of the requested changes and receipt of a revised purchase order addendum on or before [April 28, 2006]."

It is undisputed that SPS did not issue a revised purchased order by April 28, 2006.[5] Nevertheless, communications continued between the parties about outstanding matters associated with the project. On May 2, 2006, Sawyer sent Finol an e-mail as a "reminder that a response to [WPS's] list of deficiencies to the Expro/SPS Purchase Order" and a full release was "[d]ue on May 8, 2006" and the parties needed to establish a date the next week for a project "kick off" meeting.

On May 5, 2006, representatives of SPS, including Finol, and WPS, including Caime and Sawyer, met at "Expro's" office in Houston for the "Gas Injection Compressor Kick Off Meeting." Finol recorded the minutes of this meeting, which reflect, among other things, that Caime was "handling over from Proposal to the Project Stage" and Matt Hulin had been assigned as the WPS Project Manager. The minutes also reflect that a project schedule was to be issued "on Monday," a "vendor data list and status" was to be issued the "next week," and the compressor delivery days were scheduled for September 7, 14, and 21. The minutes further reflect that WPS informed the parties that "design ha[d] not yet initiated," SPS had "express[ed] concerns about the Engineering being [three] weeks late," and WPS had "express[ed] that they [would] meet the due date." On May 8, 2006, the parties traded further e-mails about project specifications. Hulin then sent Finol a letter

mail, Sawyer agreed with Caime's comments, but noted that Sawyer had been "assured by Nelson Oliveros" of Conoco that, in the event "the Expro Group" cancelled the order, WPS would "be made whole" as Conoco would "purchase the units direct from WPS or pay all cancellation charges." Sawyer recommended accepting the second purchase order so that the equipment could enter the "production schedule ASAP," and he noted that he would contact the "Expro [G]roup" regarding cancellation costs. Although SPS makes ar-

guments in its appellate briefing concerning this alleged promise from Conoco, there are no claims against Conoco before us.

5. On April 24, 2006, Caime recorded a WPS internal communication reflecting that Finol, the SPS project engineer, had called to "make certain that the motors and compressors are on order" and assure WPS that SPS would make the requested changes to the purchase order.

requesting instructions for instrument specifications that had been discussed and noting that WPS would begin ordering the "I & E devices" and Finol would receive "an updated project schedule for the three packages no later than tomorrow."

On May 9, 2006, Ibarra sent Caime another revised purchase order (the "third purchase order"), in which Expro noted that the dates in the second purchase order had been changed. The third purchase order provided for a delivery date of September 21, 2006, reflected a total purchase price of $4,143,066, stated that "Purchaser gives his full release to proceed and will pay all valid costs associated with any order cancellation," noted that the order was "subject to mutual agreement of [t]erms and [c]onditions between WPS and Expro," provided for payment of $414,307 "[u]pon [a]cceptance of this [o]rder," provided for the payment of another 10% "[u]pon submittal of [d]rawings and Release to Proceed (to be on or before [May 11, 2006])," and stated that the order was "valid until [May 11, 2006] unless Expro issue[d] a revised purchase order to proceed." A May 9, 2006 WPS internal e-mail reflects that the third purchase order complied in some respects with WPS's order acceptance form but did not comply in all respects because "the full release date has been extended" to May 11, 2006. As is detailed below, the parties then subsequently traded e-mails regarding project specifications, drawings, and other matters relevant to the project.

In response to an SPS inquiry, Sawyer, on May 12, 2006, sent Galvin an e-mail detailing, as of June 2, 2006, the "Major Equipment Cancellation Charges," including $325,000 for the motors and at least $160,000 for the compressors. He also noted that he was waiting on information from the cooler vendor. On May 16, 2006, Finol sent Sawyer an "official notice" that

the purchase order had "been cancel[led]." Finol instructed WPS to "stop all the work that is going on now and prepare and submit the cancellation fees as of today." He also apologized for "all the problems" that the cancellation may have caused.

WPS, on May 20, 2006, sent SPS an invoice detailing "valid costs associated with order cancellation per executed purchase order" and "payment of cancellation fee" per the purchase order. The invoice reflected costs associated with cancellation, including $139,008 for the Dresser–Rand compressors, $292,340 for the Reliance Motors, and $9,928 for the Amercool Process Coolers, for a total of $441,276. The invoice further reflected a "cancellation fee" of $414,306.60.

SPS then filed against WPS a declaratory judgment action regarding its "rights and duties with respect to WPS in relation to the purchase of gas compressor packages." Expro Americas subsequently intervened in the suit. SPS alleged that the parties had failed to reach an agreement on the terms and conditions of a contract; no contract existed between them; if a contract existed, it was based on the April 10, 2006 proposal; the cancellation fee of $217,361.32 was the amount owed to WPS; the terms of any contract were ambiguous; and it was SPS's intent to only pay cancellation fees in the event of cancellation. WPS then filed its answer and counterclaims against Expro Americas and SPS for breach of contract, quantum meruit, and promissory estoppel.

After trial, in regard to WPS's breach-of-contract claim, the jury found that Expro Americas and SPS had agreed to purchase three gas injection compressors from WPS for $4,143,066 "with a payment … of 10% on acceptance" and "all valid costs resulting from order cancellation." The jury further found that both Expro Americas and SPS had failed to comply

with the agreement and WPS was entitled to $855,342.55 in damages for Expro Americas and SPS's breach of contract. The amount awarded by the jury comported with the amounts invoiced by WPS, i.e., the costs associated with cancellation payable to the component providers as well as the fee of approximately $414,000 owed to WPS.[6] The trial court granted Expro Americas's motion for judgment notwithstanding the verdict and entered a judgment providing that WPS take nothing from Expro Americas. The trial court then entered judgment in favor of WPS against SPS, awarding WPS damages in the amount of $855,342.55 and attorney's fees.

### Liability of Expro Americas

In its sole issue, WPS argues that the trial court erred in granting Expro Americas judgment notwithstanding the verdict because Expro Americas issued two "relevant purchase orders," it is "identified as the decision-making entity in the three other purchase orders issued by its subsidiary [SPS]," its "name appears throughout written correspondence between" the parties, it issued the "full release to proceed" to WPS, and it "agreed to be responsible to WPS for damages caused by order cancellation."

In response, Expro Americas asserts that there is no evidence that it was a party to any agreement with WPS, the negotiations and purchase orders "were between employees of SPS and WPS exclusively," the name "The Expro Group" is a trade name and does not refer to a specific company, the reference to Expro Americas in the third purchase order[7] "was a clerical error," and Kevin Galvin signed the third purchase order on behalf of SPS and had no authority to sign it on behalf of Expro Americas.

A trial court may grant a motion for judgment notwithstanding the verdict if a directed verdict would have been proper. Tex.R. Civ. P. 301. We review a trial court's granting of a judgment notwithstanding the verdict under a legal sufficiency standard, viewing the evidence and inferences in the light most favorable to the jury's finding. *See City of Keller v. Wilson,* 168 S.W.3d 802, 807, 823 (Tex. 2005) (stating that "the test for legal sufficiency should be the same for summary judgments, directed verdicts, judgments notwithstanding the verdict, and appellate no-evidence review"). We will sustain the granting of a judgment notwithstanding the verdict based on "no evidence" when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the trial court is barred by the rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is not more than a scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Id.* at 810.

To determine whether there is sufficient evidence to support the jury's findings

---

6. In regard to WPS's quantum meruit claim, the jury found that WPS performed compensable work for Expro Americas and SPS and the reasonable value of the work was $855,342.55. In regard to WPS's promissory estoppel claim, the jury found that WPS substantially relied to its detriment upon a promise made by Expro Americas and SPS and WPS was entitled to damages in the amount of $441,276.25.

7. The third purchase order actually identifies the corporate entity as "Expro Americas Inc." rather than "Expro Americas LLC." Neither party discusses this distinction. Consistent with the parties' treatment of the matter in the trial court and on appeal, we will simply refer to both entities as Expro Americas.

against Expro Americas, we begin by analyzing the significant number of documents entered into evidence. WPS presented to SPS its original proposal, which Caime submitted via e-mail to Finol using an e-mail address that referred to the Expro Group. The April 11, 2006 letter of intent, authored by Galvin, from SPS to WPS contained the Expro Group logo, the SPS logo, and SPS's contact information. In the letter, Galvin stated that "Expro" was pleased to inform WPS of its intent to issue a purchase order. In its order acceptance form, WPS identified its customer as "ExproGroup–SPS." In multiple e-mails, WPS representatives referred to their customer as "Expro Group/SPS" or, simply, "SPS." WPS communicated with SPS representatives using e-mail addresses that referred to the "Expro Group" or "surfaceproduction.com." The minutes of the May 5, 2006 kick-off meeting were printed on letterhead with the logo of the Expro Group and SPS, identify "Expro" as the meeting location, identify the attendees as WPS and SPS, and set forth various actions that were required by SPS.

The first and second purchase orders identify the purchaser as SPS and contain the contact information for SPS, but also include references to Expro. Significantly, the third purchase order identifies "Expro Americas, Inc." as the purchaser, includes references to "Expro" and SPS, and contains the contact information for "Expro Americas." The third purchase order was sent to WPS with a cover letter stating that it was being sent by Griselda Ibarra, a business analyst for SPS, who described it as a "revised" order. Like the first two purchase orders, the third purchase order, within its terms, referred to "Expro" without making any distinction concerning which particular corporate "Expro" entities were involved in the transaction. Following cancellation of the project, WPS submitted its invoice to Kevin Galvin at SPS.

The undisputed evidence at trial reveals that Expro Americas is SPS's parent company and the "Expro Group" is a "trade name." Eric Nelson, who is Expro Americas's in-house counsel, but who also appeared as SPS's corporate representative at trial, stated that Expro Americas had "no involvement whatsoever with this project" because it "is an upstream oil and gas service company" that provides services like well testing, wireline work, and subsea well intervention—"[t]hings that are unrelated to engineering production facilities." In regard to the third purchase order, which is the critical contractual document in this case, Nelson testified that Ibarra had mistakenly printed it on an Expro Americas form and it should have instead been printed on an SPS form. Although Expro Americas asserts that the jury could not disregard this evidence, neither it nor SPS offered any detailed evidence to explain how Ibarra, who was allegedly only an employee of SPS, could have accidentally accessed and used Expro Americas's purchase orders. Additionally, as discussed below, neither Expro Americas nor SPS offered any reasoned explanation as to why other high-level Expro Americas and SPS personnel who reviewed the purchase order had failed to alert anyone that the transacting party was SPS and not Expro Americas, at least until the dispute arose.

In addition to the fact that Expro Americas is the contracting party identified in the third purchase order, WPS contends that it presented evidence that the term "Expro," as used in other correspondence, purchase orders, and documents, could have been used to refer to "Expro Americas." WPS asserts that "the documents issued from the SPS/Expro Americas side of the negotiations created confusion be-

cause they interchangeably and indiscriminately referred to 'SPS' and Expro as the contracting party, without clearly or consistently identifying who 'Expro' was other than Expro Americas." Because of this, WPS argues, the jury reasonably identified Expro Americas as at least one of the contracting parties and the jury "obviously did not find Expro Americas' evidence persuasive."

Although Expro Americas presented some contrary evidence, legally sufficient evidence supports the jury's findings that Expro Americas was a contracting party. As noted above, the third purchase order, which is the most important contractual document in this case and which provided WPS with the important "release to proceed," expressly identifies "Expro Americas Inc." as the purchaser. It also includes the contact information for Expro Americas and contains other references to Expro. Tom Sawyer of WPS testified that when WPS received the third purchase order, WPS "noticed" the identity of the contracting party. Sawyer explained that "on one they use SPS, and the other they use Expro. The[y] use them interchangeably and together." Sawyer further explained that when WPS received the third purchase order, WPS did not call and ask "where's SPS." The identification of Expro Americas as the contracting party, he explained, was not a concern because "continually it was SPS/Expro Group" throughout the parties' dealings. The jury could have considered Sawyer's testimony as evidence that the identification of Expro Americas as the purchaser in the third purchase order was consistent with WPS, SPS, and Expro Americas's prior business practices of treating both Expros Americas and SPS as parties contracting with WPS.

Tom Caime of WPS similarly testified that he considered the contracting entity "to be one entity, Expro/SPS" because "[t]hat's how they presented themselves. That's how their paperwork was. Their e-mails [were] interchangeable." Caime stated that he "didn't see any distinction" between the companies. When asked about who he believed Galvin represented in his communications, Caime noted that because he had seen Galvin's name on "Expro" and SPS documents, he "assume[d] [Galvin] represent[ed] whatever piece of paper he sends me." Although Expro Americas asserts that "Expro," when used in the general sense, could have referred only to the "Expro Group" and not "Expro Americas," it has not cited any evidence conclusively establishing this assertion. Again, although there is evidence that the "Expro Group" is a trade name, and although Nelson's testimony may suggest that this trade name refers to a group of "Expro" companies and not to any specific company, there is no conclusive evidence that use of the terms "Expro Americas" and "Expro" in the relevant communications and purchase orders exclusively referred only to SPS or the Expro Group and not Expro Americas.

WPS also presented evidence of another purchase order that was issued to another vendor on the IPF project. This order, like the third purchase order issued to WPS, identifies "Expro Americas, Inc." as the contracting party. The jury could have considered this order in evaluating Expro Americas's assertion, and specifically the credibility of Nelson's testimony, that Expro Americas had no involvement in the IPF project. The jury could have also considered this evidence in rejecting Expro Americas's argument that any general reference to Expro in the transactional documents could only have referred to SPS or the trade name "Expro Group" and not Expro Americas.

Moreover, Nelson admitted that SPS had never submitted a corrected third

purchase order to remedy the alleged mistake in identifying Expro Americas as the contracting party. The jury could have considered the fact that the cover letter attached to the third purchase order reflected that Kevin Galvin, Nick Matthews, and Nelson (Expro Americas's and SPS's in-house counsel, and SPS's corporate representative) were all copied with the third purchase order. Yet, there is no evidence that they raised any concern that the third purchase order had been printed on the letterhead of Expro Americas. It is undisputed that Galvin signed the third purchase order, and there is evidence that Galvin actually read the e-mail transmitting this third purchase order. Additionally, the only evidence offered to explain the alleged clerical mistake of SPS's issuance of the third purchase order on Expro

Americas's letterhead was Nelson's testimony that Ibarra had access to "that purchasing system just like any other clerk who would prepare purchase orders would have access." Neither Expro Americas nor SPS provided any detailed evidence to explain how Ibarra, who was allegedly only an employee of SPS, had access to Expro Americas's forms.[8] Based upon the evidence concerning the execution of the third purchase order and the lack of evidence explaining the issuance of the third purchase order by Expro Americas, the jury could have chosen not to believe Expro Americas's assertions that it was not involved in any way with the project. The jury could have reasonably found that the third purchase order was issued by Expro Americas and Galvin had the authority to bind Expro Americas in the transaction.[9]

---

8. Counsel for Expro Americas and SPS sought to elicit additional testimony from Nelson regarding this issue, asking him, "[H]ow could or how did the Expro or these purchase orders that were for this equipment that's made the basis of this suit ... how in the world could those end up on letterhead for Expro Americas, LLC?" However, counsel for WPS objected to this question on the ground that Nelson lacked "personal knowledge," and the trial court sustained WPS's objection. Although Nelson subsequently testified that the issuance of the purchase order on Expro Americas's letterhead did not indicate to him that Expro Americas "had any involvement in this transaction," Expro Americas and SPS did not offer any additional admissible evidence to explain how Ibarra could have mistakenly accessed the forms.

9. In post-submission briefing, Expro Americas and SPS argue that the jury was not free to disregard the evidence that Ibarra had committed a clerical error when she issued the third purchase order on Expro Americas's letterhead instead of SPS's letterhead because this evidence was "uncontroverted," there is "overwhelming evidence that WPS" considered the contracting party to be SPS and not Expro Americas, there is evidence that Expro Americas and SPS are distinct entities, there is evidence that Expro Americas would not

have been involved in the IPF project, and the jury's determinations regarding credibility had to be "reasonable." However, the evidence, as outlined above, reveals that the jury could have disbelieved Expro Americas and SPS's explanation that Expro Americas was a stranger to the contract and the project. For example, Expro Americas issued to another vendor at least one other purchase order associated with the project. Most importantly, the third purchase order was issued by Expro Americas, and this order was reviewed by in-house counsel for Expro Americas and SPS as well as Galvin. This contextual evidence would have permitted the jury to reject Expro Americas's assertion that it was not involved in the transaction and reasonably find that all parties considered that both Expro Americas and SPS were contracting parties with WPS.

In regard to the issue of authority, we note that the jury was not instructed on the doctrines of or the differences between actual and apparent authority. In its appellees' brief, Expro Americas contends that it is "undisputed" that Galvin "had no authority" to sign on behalf of Expro Americas. However, this fact was disputed at trial. Expro Americas and SPS are essentially asking this Court to consider, in isolation, and without regard to any of the other contextual evidence considered by the

Although we recognize that Expro Americas presented conflicting evidence on whether it was a contracting party with WPS, we conclude that the evidence is legally sufficient to support the jury's liability findings against Expro Americas. Accordingly, we hold that the trial court erred in granting Expro Americas's motion for judgment notwithstanding the verdict.

## Breach of Contract

■ In their first issue, Expro Americas and SPS argue that they did not enter into an enforceable contract to purchase equipment from WPS because there is no evidence that WPS accepted an offer from SPS, the evidence conclusively establishes that there was no meeting of the minds between the parties, and material terms were left open for future negotiation. In their second and third issues, Expro Americas and SPS argue that the "requirement" that they had to first provide WPS with a "release to proceed" prevented the formation of an enforceable contract because this requirement "rendered any promise illusory" and was a "condition precedent to liability or performance of any agreement."

We will sustain a legal-sufficiency or "no-evidence" challenge if the record shows one of the following: (1) a complete absence of evidence of a vital fact, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller,* 168 S.W.3d at 810. In conducting a legal-sufficiency review, a "court must consider evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it." *Id.* at 822. If there is more than a scintilla of evidence to support the challenged finding, we must uphold it. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex.1998). " '[W]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence.' " *Ford Motor Co. v. Ridg-*

jury, their evidence that Galvin was an SPS employee. They suggest that this evidence necessarily establishes that Galvin lacked the authority to bind Expro Americas. However, as outlined above, WPS presented evidence that (1) the third purchase order is on Expro Americas's letterhead and, as such, identifies Expro Americas as a contracting party, (2) the third purchase order was received and reviewed by several representatives of Expro Americas and SPS, including Galvin and Nelson, who would have know whether the issuing of the third purchase by Expro Americas was a "mistake," (3) there is no evidence that anyone at Expro Americas or SPS raised this alleged mistake until much later and after the dispute arose, (4) prior to the issuance of the third purchase order, the parties had used "Expro" generally throughout their correspondence and dealings and neither Expro Americas nor SPS made any efforts to clarify the identity of the contracting party, (5) the testimony that Expro Americas did not engage in the type of work at issue was contradicted by other purchase orders issued by Expro Americas in conjunction with the project, and (6) Expro Americas's explanation for this alleged mistake was very limited, even though Expro Americas was the only party that could have offered further admissible evidence on this matter. Thus, although Expro Americas and SPS did present evidence that Galvin was an SPS employee, the jury could have reasonably believed that when Galvin signed the third purchase order, he had the actual or apparent authority to bind Expro Americas. In light of this contextual evidence, the jury was not required to accept the evidence that the third purchase order was issued by mistake and signed by a representative that lacked the authority to bind Expro Americas.

*way*, 135 S.W.3d 598, 601 (Tex.2004) (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983)). However, if the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. *Keller*, 168 S.W.3d at 822; *see also King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex.2003). "A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement." *City of Keller*, 168 S.W.3d at 822.

In conducting a factual-sufficiency review, we must consider, weigh, and examine all of the evidence that supports or contradicts the jury's determination. *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex.1989); *London v. London*, 192 S.W.3d 6, 14–15 (Tex.App.-Houston [14th Dist.] 2005, pet. denied). We may set aside the verdict only if the evidence that supports the jury's finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust. *Cain v. Bain*, 709 S.W.2d 175, 176

(Tex.1986); *Nip v. Checkpoint Sys., Inc.*, 154 S.W.3d 767, 769 (Tex.App.-Houston [14th Dist.] 2004, no pet.).

■■■ The jury found that Expro Americas and SPS agreed to purchase three gas injection compressors from WPS for $4,143,066 "with a payment . . . of 10% on acceptance" as well as "all valid costs resulting from order cancellation," both Expro Americas and SPS failed to comply with the agreement, and WPS was entitled to $855,342.55 in damages. The elements of a valid contract are "(1) an offer, (2) an acceptance, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding." *DeClaire v. G & B McIntosh Family Ltd. P'ship*, 260 S.W.3d 34, 44 (Tex.App.-Houston [1st Dist.] 2008, no pet.). The determination of a meeting of the minds, and thus offer and acceptance, is based on the objective standard of what the parties said and did and not on their subjective state of mind.[10] *Baroid Equip., Inc. v. Odeco*

---

10. WPS notes that, in determining the existence of a contract between it and Expro Americas and SPS, we should also consider Article 2 of the Texas Business and Commerce Code, which applies to the sale of goods. *See* TEX. BUS. & COM.CODE ANN. §§ 2.101–725 (Vernon 2009 & Supp. 2011); *see also Valero Mktg. & Supply Co. v. Kalama Int'l*, 51 S.W.3d 345, 351–52 (Tex.App.-Houston [1st Dist.] 2001, no pet.) (applying chapter 2 of the Uniform Commercial Code to contract for sale of goods). WPS emphasizes that a "contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract"; an "agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined"; and "[e]ven though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate reme-

dy." TEX. BUS. & COM.CODE ANN. § 2.204. WPS further emphasizes that "[u]nless otherwise unambiguously indicated by the language or circumstances . . . an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances." *Id.* § 2.206(a). Finally, WPS emphasizes that "[c]onduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract" and "[i]n such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this title." *Id.* § 2.207(c). Tracking the language of these statutory provisions, WPS tendered instructions for the jury to the trial court, which refused to provide the instructions to the jury. Expro Americas and SPS argue that because the trial court submitted the case to the jury under common law principles and refused

*Drilling, Inc.*, 184 S.W.3d 1, 17 (Tex.App.-Houston [1st Dist.] 2005, pet. denied).

The testimony of the witnesses and the documents in the record reveal that, during the course of the negotiations between the parties spanning April and May 2006, Expro Americas and SPS were generally attempting to limit their commitment to WPS until they could obtain firmer commitments from Conoco, but, at the same time, Expro Americas and SPS were seeking to ensure that, in the event the construction of the IPF proceeded, they could satisfy the deadlines imposed by Conoco. In contrast, WPS was attempting to solicit firmer commitments from Expro Americas and SPS because, in order to provide them with delivery of the compressor packages by the required September time frame, WPS needed to both order component parts and also commence its own work. As a result of these conflicting positions and interests, the number of documents relevant to the formation of the contractual relationship is substantial.

As early as April 13, 2006, WPS informed Expro Americas and SPS that, pursuant to the first purchase order, it was compelled to order the compressors from Dresser–Rand. This evidence, together with the evidence establishing that the parties had subsequently acknowledged that the compressors had been ordered and there would be cancellation charges, supports an implied finding that the parties had a meeting of the minds at least with respect to that portion of the purchase order. The evidence establishes that WPS ordered the compressors to avoid a price increase that would have been passed to Expro Americas and SPS,

WPS communicated this fact to them, and they raised no objections. In fact, subsequent documents, including the minutes of the kick-off meeting, which was held at the "Expro" location, support an implied finding that Expro Americas and SPS consented to this action. Moreover, after third purchase order was cancelled, Waldemar Finol, on behalf of "The Expro Group–SPS Inc.," instructed WPS to both stop work and submit cancellation charges, thus acknowledging that the parties had a contractual relationship for both the timely acquisition of equipment and the performance of work. Thus, contrary to Expro Americas and SPS's assertion, there is ample evidence that the parties entered into an enforceable contract.

■ In regard to whether the parties entered into a contract on the terms that the trial court submitted to the jury, we note that the evidence supports an implied finding that, at a minimum, the parties, following the issuance of the first purchase order, entered into a contract regarding the purchase of certain component parts and the payment of cancellation charges. Thereafter, WPS replied with a conditional acceptance to the second purchase order. WPS also stated that its conditional acceptance depended upon the receipt of a revised purchase order by April 28, 2006. Although it is undisputed that Expro Americas and SPS did not issue a revised purchase order by this date, the evidence in the record reveals that the parties continued their discussions and negotiations over those matters that had yet to be resolved. Written communications reveal that the parties operated as if they had

---

WPS's proposed instructions, we should not consult these provisions in conducting our sufficiency analysis. *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex.2000) (providing that we assess sufficiency of evidence according to instructions given by trial court to jury). We

do not directly address the parties' dispute regarding the applicability of these provisions to our appellate review because we conclude that, under the charge as given, sufficient evidence supports the jury's findings.

additional time to resolve the outstanding differences. Significantly, on May 5, 2006, the parties conducted a joint kick-off meeting where, as revealed by the minutes, SPS representatives expressed concern that WPS's engineering work had been delayed, but WPS indicated that it intended to timely perform by the due date. The minutes reflect that WPS was performing under the terms of the second purchase order by making further preparations for the compressor packages and staffing decisions for the project, such as assigning a project manager. WPS committed to issuing a project schedule the next week, and Expro Americas and SPS agreed to furnish WPS with certain information. On May 8, 2006, Hulin, WPS's project manager, followed up with Finol and asked that he send to Hulin the "instructions for the instrument specifications" that they had discussed so that WPS could "begin ordering" certain devices. Hulin also explained that an updated project schedule would be forthcoming the following day. Finol replied by e-mail with the instructions.

Expro Americas and SPS submitted their revised third purchase order on May 9, 2006, agreeing in writing to virtually all of the matters that had remained unresolved to that date. They, for the first time, agreed upon the delivery date of September 21, 2006, which WPS had previously demanded. And the record supports an implied finding that, even before May 9, 2006, the parties were operating with the understanding that the September 21, 2006 delivery date controlled and WPS was already performing its work even though Expro Americas and SPS had waited several weeks to issue the revised third purchase order.[11] Second, and most impor-

tantly, Expro Americas and SPS provided in the third purchase order a "full release to proceed" and agreed to "pay all valid costs associated with any order cancellation." In his testimony, Galvin conceded that the term "Release to Proceed" "basically means that one party is in agreement," authorizing the other party to go forward. Galvin also stated that it would be fair to interpret the "Release to Proceed" language as authorizing WPS to "immediately" go forward. The evidence indicates that WPS had previously sought the release to proceed so that it could "diligently" perform its obligations under the contract. The jury could have reasonably concluded that WPS, having now obtained the release in the third purchase order and Expro Americas and SPS's promise to pay cancellation charges and a 10% initial payment, was contractually obligated to perform and meet the delivery date. And, the third purchase order specifically included the requested payment terms of WPS.

One potential issue that remained was that Expro Americas and SPS had not stricken the language that the order was valid until May 11, 2006 unless "Expro" issued a revised "purchase order to proceed." And Expro Americas and SPS did not alter the language that the second 10% payment would not be made until they provided a release to proceed. However, neither of these matters would have precluded the formation of an enforceable contract for the terms stated. As noted above, the third purchase order contained an unconditional release to proceed. Additionally, there is no evidence that Expro Americas and SPS ever issued another revised order affecting the validity of the

---

**11.** The original proposal indicated that WPS would need 22 weeks to complete its work. The April 20, 2006 conditional acceptance noted that the 22–week period would expire on September 21, 2006, which was still used

in the third purchase order. Thus, the jury could have reasonably inferred that WPS's work had to have commenced before May 9, 2006.

third purchase order. By its plain terms, the order was valid and ripe for acceptance.

WPS presented sufficient evidence that it relied upon the third purchase order to continue its work so that it could furnish Expro Americas and SPS the compressor packages by the agreed upon delivery date. For example, on May 9, 2006, Ibarra sent WPS representatives "specifications, drawings, and datasheet[s]" relevant to the compressors. On May 10, 2006, Hulin e-mailed Finol the "preliminary General Arrangement Drawing for the Expro Project," and Hulin solicited Finol's general comments and recommendations on the "overall layout" as well as location of the "Variable Volume Pockets for the Cylinders" in relationship to the "edges of the skid." The jury could have reasonably found that this evidence established that WPS was proceeding diligently in performing its duties under the contract. On May 11, 2006, Hulin sent Finol an e-mail inquiring about technical issues associated with the "attachment system for the compressor skid to the barge floor." On May 12, 2006, Hulin furnished Expro Americas and SPS with an updated project schedule and vendor document delivery schedule. The record contains numerous other e-mails and documents illustrating that WPS, throughout this time frame, was performing services under the contract by ordering component parts and working with vendors. On May 12, 2006, in response to Galvin's inquiry about possible cancellation charges, Williamson at WPS stated that it was ordering "I beams today" so "cancellation charges" were "increasing." Sawyer then e-mailed Galvin, asking that he "keep [him] posted on the progress" of the project and explaining that WPS was "moving ahead in order to maintain our targeted delivery dates for the compressor packages." Again, from all of this evidence, the jury could have reasonably found that

both parties were aware that WPS was operating under the terms of the third purchase order to timely deliver the compressors.

 Expro Americas and SPS argue that they did not have an enforceable contract with WPS because the terms and conditions of any agreement were left open for future negotiations. We recognize that, "[i]n order to be legally binding, a contract must be sufficiently definite in its terms so that a court can understand what the promisor undertook." *T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex.1992); *see also Lamajak, Inc. v. Frazin*, 230 S.W.3d 786, 793 (Tex.App.-Dallas 2007, no pet.) ("For an enforceable contract to exist, the legal obligations and liabilities of the parties must be sufficiently definite."). The material terms of the contract must be agreed upon before a court can enforce the contract, and "[w]here an essential term is open for future negotiation, there is no binding contract." *T.O. Stanley Boot Co.*, 847 S.W.2d at 221; *Lamajak*, 230 S.W.3d at 793 ("The contract must be certain and clear as to all essential terms or the contract will fail for indefiniteness."). Here, WPS, in its conditional acceptance of the third purchase order, did not reassert its previous requests concerning other terms and conditions and accepted the contract on the governing terms. Even if these matters had not been resolved, there is nothing in the record to substantiate Expro Americas and SPS's assertion that a previously unidentified term or condition precluded the formation of an enforceable contract. Although Expro Americas and SPS cite us to various terms and conditions that were not agreed upon, the jury could have concluded from the evidence presented that there simply were no remaining unresolved material terms that precluded the parties from entering into a contractual relation-

ship. Accordingly, we hold that the evidence is legally and factually sufficient to support the jury's breach-of-contract findings.

Finally, in regard to Expro Americas and SPS's argument that the purchase orders were illusory because of the requirement of a "Release to Proceed," which they considered to be a condition precedent, we note that their third purchase order actually contained an unequivocal release to proceed. There is evidence that, at the time they had issued the third purchase order, WPS had already been performing in anticipation of timely delivering the compressor packages. To the extent that there is any merit to Expro Americas and SPS's arguments regarding the release to proceed, those arguments were mooted by the issuance of the release.[12]

We overrule Expro Americas and SPS's first, second, and third issues.

### Damages

In their fourth issue, Expro Americas and SPS argue that the trial court "erred in instructing [the jury] on the measure of damages" and WPS presented "no evidence of damages recoverable for breach of contract" because neither of the damage elements submitted by the trial court, i.e., the "agreed payments" and the "cancellation charges," "define[d] a measure of damages recognized by Texas law for breach of contract." Expro Americas and SPS further assert that WPS presented no evidence of "benefit of the bargain" or reliance damages, "cancellation charges . . . are not damages," there is "no evi-

dence of any expenditure made by WPS," and the "agreed progress payments" and the cancellation charges do not provide any evidence of the "reasonable value of any goods or services."

At the trial court's charge conference, Expro Americas and SPS objected to the submitted breach-of-contract damages question on the ground that there is no evidence "of any of the elements of contract damages," "lost profits," or "reliance damages." Expro Americas and SPS also tendered a question that would have instructed the jury to award "[e]xpenditures made by [WPS] in preparation for or performance of the agreement, if any." After refusing Expro Americas and SPS's tender, the trial court asked the jury to determine the amount of damages that would fairly and reasonably compensate WPS for its damages caused by Expro Americas and SPS's breach. It instructed the jury that it could consider as the "elements of damages" "the amount of any agreed payments to WPS" and "valid cancellation charges that WPS incurred in connection with the cancellation of the agreement." The jury found that WPS was entitled to $855,342.55 in damages, which generally comported with the amounts invoiced by WPS, i.e., the cancellation charges payable to the component providers, approximately $441,000, and the initial "agreed payment" owed to WPS, approximately $414,000.

WPS, in regard to the jury instruction and its incurred cancellation charges, presented evidence of the amounts that it invoiced for each cancellation charge, and these amounts totaled approximately $441,000.[13] WPS also introduced into evi-

---

**12.** In regard to Expro Americas and SPS's argument that the third purchase order's release to proceed was not "full" because the order "still reserved to SPS the right to issue a revised purchase order to proceed," the jury could have reasonably concluded that the fact that Expro Americas and SPS had retained

the right to issue a revised order did not preclude WPS from relying upon the order's release to proceed diligently in satisfying the terms stated in the order.

**13.** We note that the record reveals that the term "cancellation charges" was used by the parties below to refer both to amounts that

dence communications with each of its third-party component providers reflecting their cancellation charges to WPS. For example, WPS presented the testimony of Tony Blue of Reliance Electric, who confirmed that WPS owed his company $292,000 for its cancellation fees, and he explained that WPS was on "credit hold" because WPS still owed these amounts. The evidence of cancellation charges demonstrated actual outstanding amounts for which WPS was being held accountable as a direct result of the cancellation of the contract.

■ The third purchase order expressly provided that Expro Americas and SPS would pay WPS "all valid costs associated with any order cancellation." In fact, when Expro Americas and SPS sent WPS their cancellation notice, they expressly instructed WPS to submit the cancellation fees. Yet, Expro Americas and SPS ultimately refused to pay the cancellation charges, based, at least in part, upon their contention that they had not formed a contractual relationship with WPS. We have detailed above the evidence supporting the jury's finding that the parties did form a contractual relationship. We have also detailed the evidence demonstrating that the terms of the parties' contract included, among other things, Expro Americas and SPS's agreement to "pay all valid costs associated with any order cancellation." The trial court's instruction to the jury that it could consider these cancellation charges in awarding damages is supported by the evidence. Moreover, the trial court's instruction was consistent with the instruction actually tendered by Expro Americas and SPS, which would have allowed the jury to consider WPS's expenditures made in preparation for or performance of the agreement. Accordingly, we hold that the trial court did not err in instructing the jury that it could consider, in determining the damages caused by Expro Americas and SPS's breach, the cancellation charges incurred by WPS. *See Chung v. Lee,* 193 S.W.3d 729, 733 (Tex. App.-Dallas 2006, pet. denied) (providing that party that has made substantial investment in performing agreement that is later breached may seek return of investment through recovery of reliance damages); *see also* E.A. FARNSWORTH, Contracts § 12.16, at 888–89 (1982) (noting as examples of reliance damages party's expenditures for labor and materials and other costs of preparation and purchaser's spending money or making commitments for advertising, acquiring premises and equipment, hiring employees, and the like). We further conclude that, although there is some conflicting evidence on the amounts of cancellation charges owed or paid by WPS as a result of Expro Americas and SPS's cancellation of the contract, WPS presented legally and factually sufficient evidence to support an award of approximately $441,000 based upon incurred cancellation charges.

■ In regard to the jury instruction pertaining to the "agreed payments," WPS presented evidence that the terms of the parties' contract included Expro Americas and SPS's agreement to pay WPS an initial payment of approximately $414,000 "upon acceptance" of the order. It is undisputed that Expro Americas and SPS failed to make this initial payment. As detailed above, WPS presented evidence demonstrating that, prior to receipt of the cancellation notice, WPS was, pursuant to the contract, performing in an effort to timely deliver the compressor packages by

WPS owed to third-party equipment providers and amounts claimed by WPS once the contract was cancelled.

the September 21, 2006 deadline. For example, WPS presented evidence that it had expended significant efforts associated with fabricating the compressor packages, making staffing decisions, participating in technical discussions with SPS, participating in meetings, working with vendors, and attending to various other matters in furtherance of the contract. Moreover, in the cancellation notice, Expro Americas and SPS expressly instructed WPS to "stop all the work that is going on now," thus acknowledging that WPS was working to fulfill its contractual obligations at the time of the cancellation.

■ Based upon this evidence, the jury could have rejected Expro Americas and SPS's arguments that WPS was not owed any amounts under the contract for its performance prior to receipt of the cancellation notice. Instead, the jury could have reasonably found from the testimony and documentary evidence that WPS had engaged in substantial work in the performance of the contract. Additionally, in determining the appropriate amount of damages to award, the jury could have also considered the amount of the initial payment, agreed to by Expro Americas and SPS, due to WPS. The jury could have reasonably found that the amount of the agreed payment related to the value of

the services provided by WPS in furtherance of the contract.[14] Here, WPS presented testimony that the agreed-upon first and second 10% payments related to the work that WPS was required to perform upon acceptance of the contract. For example, WPS presented evidence that, during negotiations, it was concerned about the payment structure because a 10% initial payment only covered "order value" but would not have "cover[ed] the cost of equipment" that it needed to procure. WPS was also concerned that, unless modified, the payment structure would not have allowed it to "get paid" for its drawings, vendor charges, and studies. From the evidence, the jury could have reasonably inferred that an amount generally consistent with the initial agreed payment represented the approximate value of the services and work that WPS was required to perform upon accepting the purchase order and during the weeks prior to the contract's cancellation, i.e., working with vendors, making staffing decisions, and participating and engaging in technical discussions and work. Moreover, the trial court's instruction merely allowed the jury to consider the amount of any agreed payments; the instruction did not compel the jury to award the amount of the agreed payment.[15] Thus, we cannot

14. We understand our dissenting colleague's concern as to whether the jury charge properly reflected a reliance measure of damages. However, nothing in Texas law precluded the fact finder from considering the amounts of the agreed payments in assessing the value of the services rendered by WPS and then using the payment amounts to calculate the appropriate amount to award to WPS to fairly and reasonably compensate it for its damages resulting from Expro Americas and SPS's breach. Based upon the evidence presented in this case, the jury could have determined that the agreed payments set forth by the parties in the contract were relevant in assessing the value of WPS's services performed in furtherance of the contract.

15. In their reply brief, Expro Americas and SPS complain that by "seeking the first progress payment of 10% ... for performing no work other than 'accepting' a purchase order as well as cancellation charges it failed to prove it ever paid to vendors, WPS is attempting to gain a *windfall* and occupy a better position than if the contract had been performed." (Emphasis added.) However, as noted above, WPS presented substantial evidence that it did more than merely "accept" a purchase order. It presented evidence concerning the work it performed and the cancellation charges that it owed to several vendors. To the extent that Expro Americas and SPS's reply brief can be construed to suggest that the 10% payment is a liquidated damage that

say that the trial court erred in instructing the jury that, in awarding WPS its breach-of-contract damages, it could consider, along with the cancellation charges, the amounts of any contractually-agreed payments.[16] Accordingly, we hold that the trial court did not err in instructing the jury that it could consider any agreed payments and charges in awarding damages to WPS. We further hold that the evidence is legally and factually sufficient to support the jury's damages findings.

We overrule Expro Americas and SPS's fourth issue.[17]

### Jury Instruction

██ In their fifth issue, Expro Americas and SPS argue that the trial court erred "in commenting on the evidence and erroneously instructing the jury that it could read together separate documents to form a contract because there was no evidentiary basis for this submission, this instruction pertains to a "matter for the court and not the jury," it is a "rule of contract construction, not of contract formation," and "it presupposes that the parties have made an enforceable contract."

The instruction about which Expro Americas and SPS complain provided,

Separate documents or contracts pertaining to the same transaction may be read together to ascertain the parties' intent, even if the parties executed the instrument at different times and the instruments do not expressly refer to each other.

Expro Americas and SPS acknowledge that this instruction is generally a correct statement of law. *See Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 840 (Tex.2000) (providing that it is "well-established law that instruments per-

---

is actually an unenforceable penalty because WPS did nothing in furtherance of the contract other than to "accept" it, Expro Americas and SPS ignore the conflicting evidence on this point. Moreover, although the issue is not clearly raised on appeal, we note that a party asserting that a contractual provision constitutes an unenforceable penalty bears the burden of demonstrating the applicability of this defense. *See Fluid Concepts, Inc. v. DA Apartments Ltd. P'ship*, 159 S.W.3d 226, 231 (Tex.App.-Dallas 2005, no pet.). Here, Expro Americas and SPS's argument is that WPS is achieving a windfall because it performed no work other than merely "accepting" the purchase order. As we have discussed at length, WPS presented evidence that it undertook significant efforts in performance of the contract. The jury also could have considered Expro Americas and SPS's arguments in determining the amount of damages to award to WPS because, as we note, the trial court simply instructed the jury that it could consider the cancellation charges and agreed payments, but its instruction did not compel an award of these amounts.

16. Again, nothing in Texas law would have precluded the fact finder from considering the agreed payments in determining the appropriate amount of damages to award to WPS to compensate it for its work performed in furtherance of the contract. Here, the parties, sophisticated business entities, contractually agreed that WPS would be entitled to certain payments, including a 10% initial payment. WPS presented testimony from which the jury could have reasonably inferred that the first (and possibly even the second) agreed payment was negotiated to compensate WPS for the services that it was required to provide in furtherance of the contract upon accepting the contract. Although an alternative jury instruction might have more generally referred to a reliance measure of damages, we conclude that the trial court, given the evidence before it, did not commit reversible error in instructing the jury that it could consider the agreed payments in determining the amount of damages to award to WPS.

17. Having held that the evidence is legally and factually sufficient to support the jury's breach-of-contract findings, we need not consider Expro Americas and SPS's arguments in their sixth and seventh issues pertaining to WPS's quantum meruit and promissory estoppels claims.

taining to the same transaction may be read together to ascertain the parties' intent, even if the parties executed the instruments at different times and the instruments do not expressly refer to each other"; "a court may determine, as a matter of law, that multiple documents comprise a written contract"; and "[i]n appropriate instances, courts may construe all the documents as if they were part of a single, unified instrument"). Expro Americas and SPS argue that the instruction should not have been provided to the jury because there is no controlling authority indicating that "unexecuted documents and e-mails that were exchanged for purposes of negotiating a contract could be the basis for a jury to construct a final agreement between the parties."

 At trial, Expro Americas and SPS objected to the trial court's instruction on the ground that the evidence in the case demonstrated that "if there was any contract, it was contained within one particular purchase order and not in a series of documents." Although we are not aware of any authority providing that a jury may not be instructed in accord with this well-settled point of law, we conclude that the complaint being raised on appeal, i.e., the trial court erred in instructing the jury as it did because the instruction pertains to contract formation rather than contract construction, has been waived. *See* Tex.R. Civ. P. 274 (providing that party objecting to charge "must point out distinctly the objectionable matter and the grounds of the objection" and "[a]ny complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections"). We limit our review to Expro Americas and SPS's complaint that there was no evidentiary support for the trial court's instruction, as this is the complaint that Expro Americas and SPS asserted at trial.

We conclude that there was an evidentiary basis for the trial court's instruction and the jury was entitled to consider multiple documents in determining the parties' intent regarding the ordering of certain component parts and the remainder of the purchase order. The jury was permitted to consider the first, second, and third purchase orders, the conditional acceptance form of WPS, and the e-mails between the parties regarding the terms. As discussed above, these documents were relevant to the jury's consideration of whether the third purchase order reflected the resolution of the remaining material terms. Accordingly, we hold that the trial court did not err in instructing the jury on separate documents as relevant to ascertaining the parties' intent.

We overrule Expro Americas and SPS's fifth issue.[18]

### Offer to Pay Cancellation Charges

 In their eighth issue, Expro Americas and SPS argue that the trial court erred in not admitting into evidence pretrial offers made by Expro Americas and SPS to WPS to "pay cancellation charges" because Expro Americas and SPS were entitled to prove that they had complied with the contract by attempting to pay cancellation fees and WPS had failed to mitigate its damages.

 Evidence of "furnishing or offering or promising to furnish ... a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount is not

---

**18.** Accordingly, we need not address WPS's separate arguments that the trial court erred in refusing to provide the jury with instruc-

tions consistent with the above-quoted provisions of the Texas Business and Commerce Code.

admissible to prove liability for or invalidity of the claim or its amount." Tᴇx.R. Eᴠɪᴅ. 408. This rule "does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice or interest of a witness or a party, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution." *Id.* We review the trial court's admission or exclusion of evidence under Rule 408 for an abuse of discretion. *MG Bldg. Materials, Ltd. v. Moses Lopez Custom Homes, Inc.,* 179 S.W.3d 51, 61 (Tex.App.-San Antonio 2005, pet. denied).

At trial, Expro Americas and SPS sought to admit into evidence a July 10, 2007 letter to WPS in which it stated that it was "reaffirm[ing] its position on cancellation fees," its total liability was $217,361.32, "Expro" understood that it might be "commercially advantageous to complete the procurement of the Reliance electric motors in lieu of order cancellation," and "[i]n order to expedite this matter and as an effort of good will, Expro offers $325,000 for settlement." Additionally, in this letter, SPS requested that WPS "revise the subject invoice" for $325,000 and "resubmit for approval and payment." Expro Americas and SPS also sought to introduce testimony from Eric Nelson, its in-house counsel, and Sawyer that, in August 2007, SPS increased its settlement offer to $414,000.

Despite their pretrial settlement offers, Expro Americas and SPS's primary factual contention at trial was that they did not form an enforceable contract with WPS. Based upon their theory, they vigorously disputed their liability for both the cancellation charges as well as the initial payment due to WPS. The jury found against Expro Americas and SPS on both issues, awarding WPS damages for both the cancellation fees and the first payment required by the purchase order. The jury awarded WPS damages well in excess of the amounts offered in settlement. We conclude that, regardless of whether there was a basis on which the trial court could have admitted Expro Americas and SPS's evidence of either settlement offer, Expro Americas and SPS have failed to explain how, under these circumstances, the exclusion of its proposed settlement offers probably caused the rendition of an improper judgment. *See* Tᴇx.R.Aᴘᴘ. P. 44.1(a)(1). Accordingly, we hold, to the extent that there was any error in the exclusion of Expro Americas and SPS's settlement offers, such error was harmless.[19] *See id.*

We overrule Expro Americas and SPS's eighth issue.

### Conclusion

We reverse the trial court's judgment notwithstanding the verdict in favor of Expro Americas. We render judgment in favor of WPS on its breach-of-contract claims against Expro Americas. Accordingly, we render judgment that WPS recover damages from Expro Americas and SPS, jointly and severally, in the sum of $855,342.55, and we further render judgment that Expro Americas and SPS are jointly and severally liable for the prejudgment interest, attorney's fees, court costs,

---

**19.** In regard to Expro Americas and SPS's arguments regarding mitigation, they do not argue on appeal that they would have been entitled to a separate mitigation instruction. However, we note that a defendant that makes an offer of mitigation "cannot implicitly or explicitly seek a release of the plaintiff's claims," but must make "an unconditional offer to mitigate." *Gunn Infiniti, Inc. v. O'Byrne,* 996 S.W.2d 854, 859 (Tex.1999). Here, Expro Americas and SPS's settlement offer required WPS to resubmit a revised invoice for $325,000 before they would agree to pay any amount.

and postjudgment interest provided for in the trial court's judgment.

Justice BROWN, dissenting.

HARVEY BROWN, Justice, dissenting.

I join in the Court's opinion except for the portion that affirms the damages awarded to WPS, Inc. (WPS). I would sustain the fourth issue brought by Expros Americas, LLC (Expro) and Surface Production Systems, Inc. (SPS), and hold that the trial court erred in its instruction on the measure of damages for "agreed payments." Further, I would reach and sustain Expro and SPS's sixth and seventh issues and hold that WPS was not entitled to recover on its quantum meruit or promissory estoppel claims. Therefore, I dissent.

**Damages**

The trial court's damages instruction directed the jury to consider two elements of damages "and none other:" (1) "the amount of any agreed payments to WPS" and (2) "valid cancellation charges that WPS incurred in connection with the cancellation of the agreement" by SPS. While there were two damages elements in the instruction, the jury was only asked one question combining both elements. The jury found that WPS was entitled to $855,342.55 in damages. This amount generally comports with the amounts invoiced by WPS, which included the cancellation charges payable to the component providers ($441,276.25) and the first "agreed payment" due under the contract upon WPS's acceptance of the order ($414,307).

As an initial matter, I agree with the Court that the trial court did not err in instructing the jury that, as part of the damages, WPS could recover the "cancellation charges." The "agreed payments"

were not, however, an appropriate measure of damages. Therefore, I would sustain Expro and SPS's contention that the "progress payment"—or as used in the jury charge the "agreed payments"—is not "a legally recoverable measure of damages for breach of contract."

"The ultimate goal in measuring damages for a breach-of-contract claim is to provide just compensation for any loss or damage actually sustained as a result of the breach." *Walden v. Affiliated Computer Servs., Inc.*, 97 S.W.3d 303, 328 (Tex. App.-Houston [14th Dist.] 2003, pet. denied). There are three damage measures for breach of contract claims: expectancy, reliance, and restitution. *Quigley v. Bennett*, 227 S.W.3d 51, 56 (Tex.2007) (citing RESTATEMENT (SECOND) OF CONTRACTS § 344 (1981)); *see also Intercontinental Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 666 (Tex.2009) (Brister, J., dissenting, joined by O'Neill, Wainwright and Medina, JJ.) ("Breach of contract damages include lost profits (expectancy), out-of-pocket expenses (reliance), and restitution"); *Chung v. Lee*, 193 S.W.3d 729, 733 (Tex.App.-Dallas 2006, pet. denied) ("damages for breach of contract protect three interests: a restitution interest, a reliance interest, and an expectation interest"). "Expectancy damages award the benefit of a plaintiff's bargain; reliance damages compensate for the plaintiff's out-of-pocket expenditures; restitution damages restore what the plaintiff has conferred on the defendant." *Quigley*, 227 S.W.3d at 56. The "agreed payments" are not an accurate reflection of any of these three measures of damages.

**1. Restitution**

WPS did not allege that it conferred any benefit on Expro and SPS, nor did it seek restitution damages.[1]

---

**1.** Restitution damages are measured by the

value to the defendant of the services and

## 2. Expectancy

"The most common interest protected in breach of contract cases is the expectation, or benefit of the bargain, interest. Protecting this interest seeks to restore the non-breaching party to the same economic position in which it would have been had the contract not been breached—thus giving the party the benefit of its bargain." *Qaddura v. Indo–European Foods, Inc.*, 141 S.W.3d 882, 888–89 (Tex. App.-Dallas 2004, pet. denied); *see also Bowen v. Robinson*, 227 S.W.3d 86, 96 (Tex.App.-Houston [1st Dist.] 2006, pet. denied) (noting that in breach of contract claims, "the normal measure of damages is just compensation for the loss or damage actually sustained, commonly referred to as the benefit of the bargain."). WPS's expectation interest is measured by its expected receipts under the contract plus consequential losses caused by SPS's breach, less any cost or other loss that WPS avoided by not having to perform.[2] *See* RESTATEMENT (SECOND) OF CONTRACTS § 347 (1981); *Qaddura*, 141 S.W.3d at 889; *Abraxas Petroleum Corp. v. Hornburg*, 20 S.W.3d 741, 760 (Tex.App.-El Paso 2000, no pet.); *Lafarge Corp. v. Wolff, Inc.*, 977 S.W.2d 181, 187 (Tex.App.-Austin 1998, pet. denied).

Under this measure of damages, WPS could have recovered the total of all "agreed payments" owed under the contract (expected receipts) plus the cancellation charges (consequential losses), less the costs WPS would have had to incur to complete performance (avoided costs).[3] But WPS did not offer any evidence of its costs savings from not having to fully perform. An expectancy measure of damages does not authorize recovery of expected revenues, or even some portion of expected revenues, without also accounting for costs saved. *See, e.g., Kormanik v. Seghers*, 362 S.W.3d 679, 689–90 (Tex.App.-Houston [14th Dist.] 2011, no pet.) (rejecting argument that expectation damages were proven as matter of law when claimant produced evidence of expected revenues but failed to produce evidence of costs that he would have incurred to fully perform agreement), *supplemented on overruling of rehearing*, 362 S.W.3d 679 (Tex.App.-Houston [14th Dist.] 2012, no pet. h.) (addressing new jurisdictional ar-

---

materials provided by the claimant. *See City of Harker Heights, Tex. v. Sun Meadows Land, Ltd.*, 830 S.W.2d 313, 317 (Tex.App.-Austin 1992, no writ) (stating that restitution "focuses on forcing the defendant to disgorge benefits that it would be unjust to keep, rather than on compensating the plaintiff. The principle that underlies the remedy of restitution is the avoidance of unjust enrichment."); RESTATEMENT (SECOND) OF CONTRACTS § 373 (1981) (stating that in case of partial performance caused by other party's breach, injured party, as alternative measure of damages, may recover "restitution for any benefit that he has conferred on the other party by way of part performance or reliance.").

2. When a party has fully performed at the time of breach, there will ordinarily be no cost savings; but it is undisputed that WPS had not fully performed under the contract at the time of breach.

3. For example, if WPS was to receive three payments of $100 under the contract, totaling $300 in revenue, and would have expended $200 to produce the compressor packages promised under the contract, its profit would have been $100. If SPS cancelled the contract before making any payments, but after WPS had expended $40 to commence production and after WPS ordered component parts that subjected it to $30 in cancellation charges, WPS's damages would have been $170—the $300 owed under the contract plus $30 in cancellation charges, less $160 in expenditures not incurred due to breach. The first $70 of the recovery restores WPS to its pre-contract position by covering the $40 expenditure on performance and the $30 cancellation charges, and the remaining $100 puts WPS in its anticipated post-contract position: $100 in profits.

guments); *Lafarge*, 977 S.W.2d at 187–88 (holding that trial court erred in submitting damages question that instructed jury to consider payments owed under contract but did not instruct jury to consider costs claimant saved by not having to fully perform); *Data Foundry, Inc. v. Silicon Integration Initiative, Inc.*, No. 03–09–00063–CV, 2010 WL 2336464, at *3 (Tex.App.-Austin June 11, 2010, no pet.) (mem. op.) (holding that trial court did not err in declining to award claimant expectation damages when claimant offered no evidence of costs or losses it avoided by not having to fully perform).[4] Allowing recovery of payments due under the contract without accounting for costs saved as a result of the breach puts the non-breaching party "in a better position as a result of the [breach] than it would have been in had it completed [performance of the contract]." *Sage Street Assocs. v. Northdale Constr. Co.*, 937 S.W.2d 425, 426 (Tex. 1996). Thus, WPS could not submit an expectation measure of damages instructing the jury to consider the payments promised under the contract without also instructing the jury to consider costs WPS saved as a result of not having to complete its performance under the contract.

### 3. Reliance

WPS's evidence, and the trial court's charge, most closely corresponded to a reliance measure of damages. Reliance damages are designed to restore the status quo at the time before the contract was made. *Geis v. Colina Del Rio*, 362 S.W.3d 100, 112 (Tex.App.-San Antonio 2011, pet. filed). Reliance damages are measured as the out-of-pocket expenditures made by one party in reliance on the actions of another party, not by the amount of lost profits and sales. *Sterling Chems., Inc. v. Texaco Inc.*, 259 S.W.3d 793, 798 (Tex. App.-Houston [1st Dist.] 2007, pet. denied). A party that has made a substantial investment in performing an agreement that is breached is entitled to have that investment returned through recovery of reliance damages. *Chung*, 193 S.W.3d at 733.

The Court renders damages in favor of WPS by assuming that the jury's damages finding reflects an award of the $414,307 initial agreed payment due under the contract and treating that amount as a proxy for the costs incurred by WPS in commencing its performance of the contract. While I agree with the Court that there is evidence that WPS began performance of the contract in an effort to deliver the compressor packages by the September deadline and incurred some costs in doing so, and that such costs are recoverable as reliance damages, the jury was not instructed to consider those costs. Nor was the jury instructed to consider the initial agreed payment less any cost savings.[5] It

---

4. *Cf. Dix v. Brooks*, No. 03–04–00408–CV, 2006 WL 903738, at *10 (Tex.App.-Austin April 7, 2006, no pet.) (mem. op.) (rejecting argument that jury's damages award failed because evidence showed only expected revenues but not costs saved when evidence included costs estimates for labor and material, evidence of work completed at time of termination, and testimony as to damages calculated by subtracting costs saved on completion of construction and payments already made from total expected contract revenues).

5. Even if the jury had been instructed to consider only the initial agreed payment and even

if there was evidence that the initial agreed payment reflected an estimate of the costs WPS would incur in the initial stages of contract performance, the jury still should have been allowed to determine the amount of the costs WPS actually incurred in partially performing the contract unless WPS proved as a matter of law that the initial agreed payment established its actual performance costs. Under the charge submitted, if the jury was expected to calculate the costs WPS incurred in pre-breach work under the contract, the jury was never told this.

was instructed to consider "any agreed payments" under the contract. The "agreed payments" are not "out-of-pocket expense" recoverable as reliance damages. *See Sterling Chems.*, 259 S.W.3d at 798.

### 4. Conclusion

Under an expectancy measure of damages, the trial court properly could have instructed the jury to consider the "agreed payments" plus the "cancellation charges," but only if it also instructed the jury to consider any costs saved by WPS as a result of not having to complete its performance under the contract. Under a restitution measure of damages, the trial court could have instructed the jury to consider both the "cancellation charges" but the second element of damages would have been the costs incurred by WPS in performing before SPS cancelled the parties' contract. The trial court's damages question did neither. SPS objected to the trial court's instruction and tendered to the trial court an instruction that reflected a proper measure of reliance damages. Therefore, the trial court erred in instructing the jury to automatically award the amount of the agreed payments without regard to whether WPS performed services and made expenditures in these amounts in reliance on the contract.[6]

We should sustain SPS's fourth issue.

### Quantum Meruit and Promissory Estoppel

Because I would sustain SPS's fourth issue, I now address Expro and SPS's sixth and seventh issues, in which they argue that WPS was not entitled to recover on its claim for quantum meruit or promissory estoppel. Generally, recovery under quantum meruit or promissory estoppel is not available when a party has an express contract that covers those matters for which it seeks recovery. *See Truly v. Austin,* 744 S.W.2d 934, 936 (Tex.1988) (stating that, as general rule, recovery under theory of quantum meruit is prohibited if express contract covers services or materials for which claimant seeks recovery). In its briefing, WPS agrees that, because it had an enforceable contract with SPS, it is not entitled to a judgment on its claims for quantum meruit or promissory estoppel. Because WPS concedes it is not entitled to seek recovery through its quantum meruit and promissory estoppel claims in light of the fact that an express contract controls, we should sustain SPS's sixth and seventh issues.

### Conclusion

In conclusion, I believe we should reverse and remand the case.

---

**6.** Moreover, because WPS contended that the "damage analysis" was "really very simple" and because the contract itself provided for the amount of the initial agreed payment that SPS was required to pay upon WPS's acceptance, WPS did not present evidence concerning the general amount that could be assigned to the services or work it performed. WPS's argument is essentially that, from the evidence presented at trial, the jury could have concluded that WPS was entitled to receive the contractually guaranteed initial payment to protect itself from a financial loss and cover any expended costs in fabricating the compressor packages, making staffing decisions, participating in technical discussions, and working with vendors. But, as instructed, the jury was compelled to award WPS the amount of the "agreed payments" instead of compensating WPS for a reliance measure of damages, which is what WPS was legally entitled to recover. I do not suggest that, upon retrial, WPS would not be entitled to seek an amount that comports with any agreed payments. But, the trial court, over SPS's objection, did not submit a proper measure of contract damages to the jury.